UNITED STATES of America,
Plaintiff–Appellee,

v.

Steven Leroy LONG, Sr., and Jackie
Don Clothier, Defendants–Appellants.

No. 88–4783.

United States Court of Appeals,
Fifth Circuit.

Jan. 29, 1990.

William J. Ziegler, Jr., Lafayette, La. (court appointed), Jackie Don Clothier.

Robert Glass, New Orleans, La., for Steven Leroy Long, Sr.

Lawrence W. Moon, Jr., Lafayette, La., William J. Flanagan, Asst. U.S. Atty., and Joseph S. Gage, Jr., U.S. Atty., Shreveport, La., for plaintiff-appellee.

Before GARZA, WILLIAMS and DAVIS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

Appellants Steven Leroy Long and Jackie Don Clothier appeal their convictions on one count of conspiracy, three counts of wire fraud, and two counts of interstate transportation of stolen property. We affirm their convictions.

The events leading to Long's and Clothier's indictment and conviction begin with Harry W. Conley, who was a buyer and seller of crude oil and did business under a small corporation named KC Gathering and Trading (KC). In December 1986, Conley became involved in a business arrangement with Crown, Coal & Coke Company of Pittsburgh (CCC) to purchase and resell oil. In connection with the arrangement, he began searching for large quantities of crude oil. He contacted defendant Clothier, apparently an old friend and business acquaintance. Several days after their initial contact, Clothier got in touch with Conley and told him he had located a barge load, about 16,000 barrels, of crude oil for sale by Merit Oil and Gas Company of Lafayette, Louisiana. Merit was owned by defendant Steven Long. Conley and Clothier agreed to the terms and conditions of the sale, subject to approval by CCC.[1] Conley then made arrangements with CCC to purchase the oil for $13.00 per barrel and resell it to an Oklahoma corporation for $16.60 per barrel.

Shortly thereafter, a Merit invoice, addressed to KC and listing 16,300 barrels of crude oil as sold at $13.00 per barrel, was telefaxed to Conley at his request. Three days later, Conley telefaxed the invoice to CCC in Pittsburgh. Albert Muse of CCC then held a telephone conference with Conley and Clothier. Muse agreed to purchase the oil and wire the necessary funds, but only after CCC received verification of the amount of oil that was purchased. The parties agreed that the amount would be certified by E.W. Saybolt & Co. and that Conley would be present during the loading process.

Conley did not attend the loading. But he was soon telefaxed a number of documents. He received an E.W. Saybolt "gauge" report, indicating that 16,324.65 barrels of oil were loaded at Bayou De-Cannes on a certain barge and tugboat. He also received a boat log for the tugboat, indicating the oil had been loaded on December 28, and an E.W. Saybolt "strapping report"[2] for tank number 16204 at Bayou DeCannes. The gauge report and the original invoice also referred to this tank. Conley telefaxed the documents to CCC in Pennsylvania. Upon receipt of the documents, CCC wired $212,220.45 from its Pennsylvania account to Merit's account in Louisiana. The day after the funds were transferred, Long purchased $81,000 worth of money orders with one of Merit's checks. He had $54,000 worth of the mon-

---

1. According to the government, the agreement provided: KC, on behalf of CCC, would purchase the oil for $9.00 per barrel. Clothier would arrange to transport the oil, which would increase the barrel price by $1.00. Conley and Clothier would add an additional barrel price of $3.00, which they would split evenly.

2. A "strapping report" calculates the amount of oil in a given storage tank.

ey orders made out to Clothier. He paid Conley $32,000 ($27,000 in money orders and $5,000 in cash).

The oil was never delivered. It did not exist. All the verifying documents were fraudulent, apparently copied and altered from other unrelated documents. Long admitted that he agreed to allow Clothier to run the transaction through his company, permitting him to use his letterhead for the invoice and to use his bank account.

A federal grand jury indicted Long on three counts of wire fraud. Later, Clothier was added to each count in a superseding indictment. In a second superseding indictment, Conley was added. This indictment also added the conspiracy and interstate transportation of stolen property counts. On September 15, 1988, the grand jury handed down an amended second superseding indictment on which the trial was to proceed.

Prior to trial, Conley entered into a plea agreement with the government. Accordingly, he entered a guilty plea to a conspiracy charge resulting from his scheme to obtain a kickback fee for arranging CCC's purchase of crude oil. He also agreed to cooperate in the prosecution of Long and Clothier.

On the morning of trial, Long and Clothier were arraigned on the amended second superseding indictment. During the arraignment, the judge allowed the United States, against objection by both defense counsel, to read into the record a change to the indictment that inserted a phrase into the language of Count IV, one of the wire fraud counts.

Before trial, counsel for Long and Clothier both filed Motions for Severance. The motions were denied and the two defendants were tried together and convicted on all counts. They now appeal the convictions.

## I. *Severance*

■ Long and Clothier both contend, for different reasons, that their trials should have been severed. We may only review a trial court's decision to deny a motion for severance for abuse of discretion. *United*

*States v. Wheeler*, 802 F.2d 778, 781 (5th Cir.1986), *cert. denied, Strauder v. United States*, 480 U.S. 908, 107 S.Ct. 1354, 94 L.Ed.2d 524 (1987). To establish abuse of discretion, the defendant must "demonstrate compelling prejudice against which the trial court was unable to afford protection, and that he was unable to obtain a fair trial." *United States v. Massey*, 827 F.2d 995, 1004 (5th Cir.1987). Neither Long nor Clothier meets this burden.

## A. Long's Motion for Severance

■ Long argues that his and Clothier's trials should have been severed to allow him to raise significant relevant evidence that was excluded. Long contends that at trial he did not deny he was involved in the transaction with Clothier and Conley but rather insisted that he did not realize the arrangement was fraudulent. His defense was that he was merely acting as a conduit through which Clothier could run his apparently legitimate transaction. Because of the nature of this defense, Long argues, he needed to offer evidence that could explain why he thought he was needed as a conduit.

The evidence he asserts Long wanted to offer dealt with "prior bad acts" committed by Clothier that had resulted in making Clothier's assets vulnerable to seizure by persons who had legal judgments against him. Long maintains that he agreed to allow his company to be used in the transaction because he knew that Clothier could not run the transaction through his own company. Since Clothier offered Long part of the "profit," which would include money that Clothier already owed him, he thought the deal was a good one.

Before trial, Long filed a motion in limine seeking a ruling that would allow him to introduce documentary evidence that included the pleadings and other documents in previous law suits against Clothier as well as Clothier's conduct leading to those suits. He sought introduction of the evidence under Fed.R.Evid. Rule 404(b), which allows such evidence "as proof of motive, opportunity, intent, preparation, plan,

knowledge, identity, or absence of mistake or accident.". The court disallowed Long's proffer of evidence on the ground that it created a risk of prejudice to Clothier.[3]

After the court ruled on the motion in limine, Long's attorney apparently advised him not to discuss in any detail the facts he was forbidden to offer in evidence under 404(b). Consequently, Long maintains, he appeared unworthy of belief throughout the trial as he attempted to answer many of the questions he was asked on the witness stand. In support of this claim, Long provides several trial excerpts, which he asserts show that he was forced to "tap dance" around the issue of his motive for entering into the relationship with Clothier. This "tap dancing" finally culminated in a colloquy at a bench conference, following Clothier's objection to the government's question of Long on cross-examination: "What kind of problem did he [Clothier] explain to you he had?" After Clothier objected, the following conversation occurred.

> THE COURT: Are you saying that he needed a legitimate company because he had problems before?
>
> MS. INGRAHAM [Long's Counsel]: That's exactly right and Mr. Long has been tap dancing around it because it was my appreciation we weren't going to get into the 404(b) material.
>
> THE COURT: I said no 404(b) on anybody. It shouldn't be used with this witness to go into with Mr. Clothier about prior bad acts.
>
> MS. INGRAHAM: Yeah. And, see, so the problem that I have is that now Mr. Long is having to talk about this problem and not explain the seriousness of the problem.

The court refused to admit the information, and the trial continued. Long maintains that if the judge was not going to allow this evidence, he should have severed Long's trial. Not severing the trials, Long argues, resulted in an unfair trial.

---

**3.** Long does not now attack the propriety of the evidentiary ruling. Rather, he only appeals the

Long's argument, although seemingly having some possible merit as presented on this appeal, does not accurately reflect at all the nature of his defense at trial. Our careful review of the record shows that Long primarily sought to introduce the 404(b) evidence not to show his motive for entering into the transaction but instead to show that Clothier had been involved in similar deals before. Long seemed to be arguing at trial that he was innocent, caught up in Clothier's improper dealings. He apparently hoped that showing Clothier's unacceptable routine practices would vindicate him. Prior to the colloquy discussed above, Long never indicated he wanted to use the evidence to show his motive for participating in the transaction. As a result, the judge could not have been expected to foresee the complication Long now claims arose in the case. Moreover, the judge's decision at the bench conference did not prohibit Long from introducing other evidence that was available to him to prove his alleged motive.

In reviewing the import of the record, we emphasize the motion in limine, the memorandum accompanying the motion, and portions of the trial transcript in which the 404(b) evidence issue arises. First, the motion in limine with the accompanying memorandum makes clear Long's intentions at that time in attempting to introduce the 404(b) evidence on Clothier. The motion lists six different incidents or types of evidence Long wished to introduce at trial. All of the incidents involve Clothier's business relationships with other companies. Long only contends that one of the paragraphs in the motion refers to his motive for becoming involved with Clothier. That paragraph has to do with a lawsuit between Clothier and Chevron. It reads:

> Defendant LONG learned that Jackie Don Clothier, through a company known as Cotco, Inc., failed to provide Chevron with oil. Defendant LONG desires a hearing on the admissibility of this evidence in order to develop *Clothier's motive* for entering into a business relation-

denial of his motion for severance.

ship with Defendant LONG. (emphasis added).[4]

Thus, the only part of the motion that Long argues raised this issue actually speaks of Clothier's activities, not Long's later asserted purpose to permit Clothier to run the transaction through Long's company. The memorandum in support of the motion makes clear Long's purpose in undertaking to introduce the evidence:

> Defendant LONG's defense is that he was conned or taken advantage of by Clothier and Conley. The evidence to be presented will show that Clothier and Conley habitually and through the companies they operated routinely took advantage of others in their business dealings.

Thus, there was no indication at all that at the time of the filing of the motion in limine Long had any intention of using the 404(b) evidence to explain his running the transaction through his company.

Second, even as the trial progressed, it did not appear that Long intended to use any 404(b) evidence to prove this motive. If anything he meant to use it to prove an opposite point, that he knew nothing of Clothier's past and was duped into becoming a part of this fraudulent deal. Prior to Long's testimony, there was a lengthy discussion about what evidence could be introduced. Long's attorney raised the issue of the evidence listed in the motion in limine. In an attempt to clarify the purposes of the evidence, the court asked Long's attorney: "Your theory is that Mr. Long didn't know about Mr. Clothier's prior activities and therefore he wouldn't have dealt with such a person?" Long's attorney answered "yes". It appears from the record, then, that Long's attorney planned to use the Chevron evidence to attack the character of Clothier. Far from wanting to show that Long knew of Clothier's prior acts and therefore understood his need for a conduit, she wanted to show that he had no idea about Clothier's previous acts and hence became yet another victim of his schemes.

This evidence, therefore, was not at all as central to Long's defense as he claims in retrospect. Long presented his entire testimony with only one or two references to the "situation" Clothier was in at the time he came to visit Long. The issue only came to the fore at Long's cross-examination, in a situation the judge never could have anticipated.

Long raised this argument for the first time after trial in his challenge to a denial of severance. While he moved to have the trials severed before trial, he did so for totally different reasons. There was no mention in the severance motion of the Chevron case evidence. Since the trial judge was never presented with this issue in deciding the motion for severance and Long does not challenge the denial of severance on other grounds, we find it clearly within the court's discretion at the late stage of the trial to continue to refuse to admit the proffered evidence.

Finally, on this issue we follow our decision in *United States v. LaCoste*, 721 F.2d 984 (5th Cir.1983), *cert. denied*, 467 U.S. 1228, 104 S.Ct. 2683, 81 L.Ed.2d 878 (1984). In that case, Bierman was one of several persons charged with conspiracy to steal barges of soybeans. At trial, his co-defendants filed a motion in limine to restrict the government's inquiry into their past involvement in grain scandals. When the court granted their motions, Bierman moved for a severed trial so he could introduce the evidence in his defense. He argued, much as Long does here, that he thought he had been involved in a legitimate transaction. In his severance motion, he contended that his co-defendants' prior criminal involvement had made them circumspect. Accordingly, they had caused Bierman to act in ways that concealed their own involvement while heightening Bierman's activity. The trial court denied the motion, determining that the only way it might be admissible was under 404(b). The judge balanced the public interest in joint

---

**4.** In connection with this paragraph, Long's attorney proffered the complaint in a case involving Cotco and Chevron along with Chevron's answer to the complaint, which accused Clothier of stealing over one million dollars worth of oil from Chevron.

trials with the risk of prejudice to Bierman and determined the risk was minimal since Bierman could prove the facts he sought to establish without resorting to this specific evidence. On appeal, we held that the judge's ruling "was clearly correct and does not begin to approach the level required for reversal." *LaCoste,* 721 F.2d at 990.

Similarly, the evidence Long sought to introduce was unnecessary to prove the point he argues he wanted to prove. If he were merely trying to show that Clothier's assets were subject to seizure from a similar suit, he could have done so without introducing the actual pleadings from the Chevron case. In fact, to a large extent, Long already had discussed this motive for entering the transaction. On direct examination, he testified:

> Q: Did he [Clothier] explain to you why you should be interested in doing this business deal with him?
>
> A: Well, the way he explained it to me, he had the oil and he had a buyer for it and he wanted me to broker it because of the situation that he was in at the present.
>
> Q: Okay. Was he concerned about selling the oil himself?
>
> A: Yes, he was.
>
> Q: Okay. And why wasn't he going to do it himself?
>
> A: Well, he had had some problems with a company in New Orleans about the Plaquemines Parish deal, the well, and the oil that came off the well, and he didn't want to sell the oil himself because there might be a controversy over it.
>
> Q: Okay. Did that seem reasonable to you?
>
> A: Yes, it did knowing the people he was involved with in Plaquemines Parish, it did.

While Long now contends that this exchange was just one example of his being forced to "tap dance" around the issue, it appears to us that it provided his defense. We see no way it detracted from his credibility. Further, since Long was permitted to testify this extensively, he also could

have explained that Clothier did not want to place funds into his own account because of an unrelated lawsuit. There was no need to go into the details of the Chevron suit to make that point.

Given the unfolding of the events at trial, the substance of the motion in limine and severance motion, and the lack of necessity for this particular evidence, we hold that the lower court did not abuse its discretion by denying Long's motion for severance.

### B. Clothier's Motion for Severance

Clothier also argues that his trial should have been severed from Long's trial. He gives two reasons. First, due to the antagonistic and mutually exclusive nature of their defenses, he contends he was unable to receive a fair trial. Second, he claims the denial of the severance motion precluded him from cross-examining Long about statements Long made during plea negotiations with the government. Clothier maintains that his and Long's defenses were antagonistic since Long was the government's best witness against him. We are unpersuaded by these reasons.

For severance to be compelled, defenses must be "antagonistic to the point of being mutually exclusive." *United States v. Berkowitz,* 662 F.2d 1127, 1133 (5th Cir. 1981). "The essence or core of the defenses must be in conflict, such that the jury, in order to believe the core of one defense, must necessarily disbelieve the core of the other." *United States v. Romanello,* 726 F.2d 173, 177 (5th Cir.1984).

■ Long's and Clothier's defenses were not mutually exclusive. Long's defense was that he did not realize the arrangement in which he was involved was fraudulent. Even though Long's testimony contained some of the details of the arrangements he made with Clothier, none of those details necessarily leads to a presumption of illegal activity on Clothier's part. Of course, Long's suggestion that Clothier initiated the transaction did not mean the transaction was fraudulent. Long's defense, then, was not, as Clothier suggests,

a placing of the blame for everything on Clothier. Moreover, Clothier offered no alternative defense and therefore never showed that Long's story directly conflicted with his own.

▮ Even if Long's defense were antagonistic to Clothier's, however, Clothier failed to show the compelling prejudice required by *United States v. Massey, supra.* Clothier maintains that Long's testimony, if believed, would destroy Clothier's presumption of innocence. But Long's testimony was not believed; he was convicted of all of the same charges of which Clothier was convicted. Clothier therefore has no basis for attacking the trial.

▮ Clothier also argues that the severance motion should have been granted because, without it, he could not cross-examine Long about statements that Long had made to the FBI during plea negotiations. The court ruled that those statements were inadmissible under Fed.R. of Evid. 410 and 403, since the judge found that the prejudicial effect would outweigh the probative value.

Clothier apparently wanted to cross-examine Long about the statements Long gave to the FBI to show that Long had changed his story during plea negotiations from the story he had given the FBI during its initial investigation. But Clothier admits that Long's statement at trial "generally conformed" to those statements he had made during plea negotiations. At trial, Clothier questioned Long at length about the statements at the initial investigation and explored the inconsistencies between those statements and the trial statements. Consequently, there was no probative value in bringing up the plea negotiation statements.

We hold, therefore, that the trial court did not abuse its discretion in denying Clothier's motion for severance.

## II. *Amendment of Indictment*

Clothier argues that the district court erred when it allowed the government to correct Count IV of the indictment at the time of arraignment. Count IV of the amended superseding indictment, upon which defendants were to be arraigned, charged the defendants with wire fraud in connection with causing CCC to wire the money from Pennsylvania to Merit's account in a Louisiana bank. After realleging the description of the scheme that was described in an earlier account, Count IV read in part:

> On or about the 29th day of December, 1986, in the Western District of Louisiana ... [defendants], for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do commerce from Pittsburgh, Pennsylvania, to Lafayette, Louisiana, by means of wire communication, certain signs, signals and sounds, that is, a wire transfer of TWO HUNDRED TWELVE THOUSAND TWO HUNDRED TWENTY AND 45/100 ($212,220.45) DOLLARS ...

Before trial, the government moved to add the phrase "so, did knowingly and willfully transport and cause to be transported in interstate" between the words "do" and "commerce." Against the objections of both defendants, the court allowed the change as a correction of a typographical error.

The government argues that the judge properly allowed the last minute addition. It contends that the deleted language did not constitute an essential element of wire fraud[5] and therefore was not substantive and could be changed without resubmission to the grand jury. *See United States v. Fischetti,* 450 F.2d 34, 39 (5th Cir.1971), *cert. denied,* 405 U.S. 1016, 92 S.Ct. 1290, 31 L.Ed.2d 478 (1972); *United States v. Young Bros., Inc.,* 728 F.2d 682, 693 (5th Cir.1984), *cert. denied,* 469 U.S. 881, 105 S.Ct. 246, 83 L.Ed.2d 184 (1984). Further, the government argues, there was no element of surprise in this case since the very words were included in an earlier indictment and were omitted only inadvertently.

---

**5.** Two essential elements are required to prove wire fraud under 18 U.S.C. § 1343. There must be proof of both a scheme to defraud and use of or causing the use of, wire communication to further the scheme. *United States v. Herron,* 825 F.2d 50, 53–54 (5th Cir.1987).

Thus, urges the government, there was no risk of double jeopardy to the defendants. *See Young Bros.*, 728 F.2d at 693.

■ We have some concern that the "knowing and willful transport" language, which the grand jury clearly intended to be a part of the charge, was omitted from the indictment on which Long and Clothier were to be arraigned.[6] We decline, however, to determine whether the district court erred by allowing the addition as a typographical correction. We decline to reach this issue because we hold that any error that might have been committed was harmless beyond a reasonable doubt.

Long and Clothier were not specifically sentenced on Count IV. Instead, their prison sentences resulted from the first count, the conspiracy count, and their probation arose from the last five counts combined. Clothier does not assert he was prejudiced by the claimed error and there is nothing to indicate that his and Long's sentences would have been any different had the district court not allowed the government to amend the indictment at arraignment. We find no reversible error.

### III. *Insufficiency Of Evidence Against Clothier*

Clothier contends that the district court erred by refusing to grant his motion for acquittal, since the evidence was insufficient to sustain his convictions. On appeal, we must affirm a conviction if, "after viewing the evidence presented and all inferences reasonably drawn therefrom in the light most favorable to the jury verdict, any rational jury could have found these essential elements beyond a reasonable doubt." *United States v. Gonzalez*, 866 F.2d 781, 783 (5th Cir.1989), *cert. denied*, — U.S. ——, 109 S.Ct. 2438, 104 L.Ed.2d 994 (1989). Viewed in this light, the record discloses more than adequate evidence to sustain Clothier's conviction.

Clothier's main contention is that the government never produced many of the documents received by Harry Conley; it only produced the documents received by

CCC from Harry Conley. Clothier therefore maintains that most of the evidence against him came from Conley's testimony. He suggests that if that testimony were carefully examined, numerous inconsistencies would appear.

■ Clothier's argument is unpersuasive since "[a]ll reasonable inferences and credibility choices which support the jury's verdict must be accepted." *Gonzalez*, 866 F.2d at 783. Not only did the jury obviously find Conley's testimony credible, reasonable inferences were drawn from Conley's testimony as well as from other evidence that supported his testimony. The fraudulent strapping report, for example, was shown to be an altered version of a dated report for tank number 104 at Bayou De-Cannes. Evidence indicated that from 1980 to 1985, that tank was leased to a company partly owned by Clothier. The fraudulent boat log was for a tugboat owned by a company that in the past had transported oil for Clothier. Clothier also received $54,-000 in money orders from Long's account. Combined with Conley's testimony, this evidence was more than sufficient to convict Clothier.

AFFIRMED.

---

**6.** Although only Clothier raises this issue on appeal, we consider it as relating to both defendants since they were treated identically in sentencing.