**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Shearn MOODY, Jr.,**
**Defendant–Appellant.**

**No. 88–6016.**

United States Court of Appeals,
Fifth Circuit.

May 30, 1990.

---

Samuel Buffone, Terrance G. Reed, Washington, D.C., for defendant-appellant.

Evan M. Spangler, Asst. U.S. Atty., Henry K. Oncken, U.S. Atty., Paula C. Offenhauser, Asst. U.S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, WISDOM and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

For nearly a generation, Shearn Moody, Jr. ("Moody"), served as a trustee of the philanthropic Moody Foundation (the "Foundation"), endowed by the will of his wealthy grandfather for the perpetual benefit of all Texans. The government maintains that Moody applied his influence as trustee to siphon, for his personal benefit, approximately $1.3 million in grants from the $460 million charitable trust. Specifically, he allegedly directed grants to fictitious tax-exempt organizations that had clandestinely pledged, in return for Foundation contributions, to subsidize Moody's civil and bankruptcy litigation that followed from the collapse of his insurance enterprise.

After a protracted three-month trial, Moody was convicted on all seventeen counts of fraud. He submits, however, that he lacked the specific intent to commit any of the crimes alleged; rather, disreputable men preyed upon his mental frailty and his deeply-held sentiment that the judicial system traditionally has been biased against his interests.

Moody raises a litany of alleged procedural and evidentiary challenges on appeal, creating the impression that the trial was rife with error. While we reject that dismal assessment, we nonetheless conclude that trial errors were committed that, viewed in combination, mandate a reversal of the conviction. Additionally, should the government reprosecute, it is free under the double jeopardy clause to retry Moody only with respect to those counts, addressed *infra*, for which sufficient evidence of mail or wire fraud was adduced at the first trial. Accordingly, we reverse and remand.

## I.

### A.

Moody shared the Foundation's trusteeship during the events relevant to this indictment with his brother, Robert Moody, and his elderly aunt, Mary Moody Northen. His tenure on the board traces back to 1954 and the genesis of the charitable trust.

Despite a four-year interruption in service during a dispute with the State of Texas concerning the proper number of trustees, Moody served as a fiduciary until 1987, at which time this indictment forced his departure.

Generally, Foundation activities are administered by a small professional staff. The staff processes approximately 400 grant applications per year for the trustees' review, and it disperses millions of dollars annually, ranking the Foundation among the nation's most generous charitable institutions. Several law firms assist the board of trustees, which meets quarterly, in evaluating the merits of the various grant applications.

The three trustees, all descendants of the original benefactor, displayed an affinity for grant proposals that appealed to their individual tastes. Robert, for example, admitted that he preferred to channel Foundation resources in the direction of medical research. His aunt, in contrast, lobbied for historical preservation and the arts, and Moody favored grants addressing the justice system. The trustees accommodated each other's preferences in order to ensure approval of projects deemed by each to be especially worthy of support.

Moody's interest in the justice system is, undisputably, a consequence of his own litigiousness: In 1985, for example, he was a defendant in approximately sixteen civil actions and a plaintiff in eleven, arising principally in connection with his past management of an Alabama insurance company that he founded. As sole shareholder of that company, and with meager initial capital, Moody successfully engineered explosive growth for the fledgling enterprise by assigning to it forty percent of his life interest in a family trust. That life interest injected desperately needed capital into the venture and spurred rapid expansion.

A subsequent controversy concerning the valuation of Moody's life interest, however, degraded the company's prospects for insuring its obligations and prompted its sudden collapse. In 1972, Alabama's insurance regulators declared Moody's insurance company insolvent and appointed a

receiver. At the time of this involuntary forfeiture, Moody remained the principal shareholder of the defunct company. Shortly thereafter, the Alabama receiver commenced a federal securities action on behalf of minority shareholders and policyholders, securing a judgment of $6.3 million (excluding interest) against Moody.

Moody regarded Alabama's prosecution of the civil action as politically inspired. A series of unsuccessful appeals followed, which served to reinforce his perception that the legal process was unfairly skewed against his caste: He had forfeited his insurance enterprise and remained liable on a burgeoning civil judgment valued, with interest, at $12 million once appeals were exhausted. Unable to dispose of this adverse judgment through the appellate process, Moody retained the legal services of Jane Ford in 1984 to petition for bankruptcy relief in North Carolina. Thereafter, a substantial portion of his assets was subject to the bankruptcy trustee's control, which only exacerbated his notion of victimization.

Contemporaneously with this bankruptcy litigation, Moody was introduced to two disreputable individuals, previously unknown to him, who were attached to an organization whose activities eventually would place Moody's tenure with the Foundation under criminal scrutiny. Vance Beaudreau and William Pabst prompted attorney Ford, who had represented Beaudreau in an earlier bankruptcy proceeding, to organize a meeting with Moody. There, they introduced themselves as representatives of the Centre for Independence of Judges and Lawyers (CIJL), an organization purportedly dedicated to aiding citizens "oppressed" by the American legal system.

Pabst and Beaudreau proclaimed that Moody had been treated by the judiciary unfairly—a phenomenon they allegedly witnessed in regard to other prominent citizens—and announced that they stood prepared to muster the "considerable" resources and political influence of the CIJL on his behalf. Moody quickly befriended Pabst and Beaudreau, allying himself, unsuspectingly, with eccentric individuals [1] and an organization heavily involved in the peddling of fraudulent tax-avoidance schemes to cash-rich individuals.

Pabst formed the CIJL from a nucleus of tax protestors who vigorously objected to federal taxation. Beaudreau served as the organization's fundraiser and solicited wealthy clients to share in the false promise of tax-free income. To that end, they secured tax-exempt status for the CIJL from the Internal Revenue Service (IRS) and announced, misleadingly, to prospective clients that their tax shelters had been formally endorsed by the IRS. To bolster their credibility, they publicly held themselves out to be lawyers or government employees. The seal of the CIJL, in fact, mimicked that of the United States Department of Justice. In a sophisticated ruse, clients were led to believe that the CIJL's fraudulent enterprise constituted legitimate tax-planning.

The CIJL's tax scheme hinged upon the establishment, for a fee, of individual taxpayers as tax-exempt "subsidiary foundations" of the CIJL. Procedurally, a taxpayer would "donate" his income to the CIJL, claiming the entirety as a charitable contribution. Thereafter, the CIJL would siphon off a percentage and "redonate" the earnings back to the taxpayer through his individual subsidiary. The taxpayer was instructed to finance all routine living ex-

---

1. Pabst describes himself in his abbreviated 100–page book, *Jury Manual: A Guide for Prospective Jurors* (1985), funded with a $375,000 Foundation grant, as a "philanthropist working to reform the judicial system." Much more than that, however, Pabst championed a crusade to enjoin the playing of the Super Bowl and to establish Texas as an independent nation before the United Nations.

Pabst boasted of his purported influence with Congress, the White House, and the United Na-

tions, as well as affiliations with the Central Intelligence Agency, Department of Justice, Bureau of Prisons, Secret Service, and the Judge Advocate General's Office of the Air Force. He addressed himself as "doctor," in deference to his law degree, and ordained himself the "Master General" of the Order of St. Germain, a religious sect limited principally to CIJL adherents.

penses strictly through his subsidiary foundation, thereby avoiding income taxation.

These fraudulent tax shelters were publicly marketed by Pabst and Beaudreau as being in strict compliance with existing tax laws. Nothing could have been further from the truth, however, as evidenced by the commencement of an IRS criminal investigation against the organization. Nevertheless, the CIJL attracted a significant corps of about fifty affluent clients, all of whom were promised commissions for enlisting additional taxpayers into the growing pyramid of CIJL clients.

Significantly, CIJL's activities were not limited strictly to tax avoidance. The organization also actively solicited—and secured—fraudulent grants from charitable trusts. In 1984, the Foundation was targeted, surreptitiously, when Pabst and Beaudreau first pledged CIJL's support for Moody in his ongoing civil litigation. Having lost his insurance business, and most of his assets to a North Carolina bankruptcy court, Moody endorsed the shared goal of correcting the injustice that he purportedly suffered. The CIJL, however, contemplated financing that "shared goal" exclusively with Foundation funds, despite initial CIJL disclaimers to Moody and his brother to the contrary.

To engender Moody's confidence, the CIJL immediately dispatched representatives to investigate the North Carolina judge's administration of Moody's bankruptcy case, hoping to secure the judge's disqualification. To that end, they compiled a pamphlet highly critical of that judge for distribution at a bankruptcy conference. Oddly, Moody endorsed such activities as constructive.

Shortly thereafter, Pabst allegedly announced to Moody that although the CIJL would not solicit Foundation grants directly, he would arrange for affiliated foundations to submit grant applications for other "worthy" projects. As promised, three CIJL subsidiaries (individual taxpayers) submitted grant applications to the Foundation, each prepared by Pabst and Beaudreau but styled, misleadingly, in the subsidiaries' individual names: The Carlson Foundation applied for $375,000 to finance a jury manual[2]; the Earl Foundation sought $150,000 to study the "dental problems" of the Comanche and Karankawa Indians and, separately, $450,000 to study the relationship between criminal behavior generally and dental defects; and the Hamilton Law Institute applied for $500,000 to "research and disseminate information" about the constitutional right to a jury trial.

All grant applications were approved by the trustees, allegedly because of Moody's intense lobbying, and despite a dearth of information concerning the merit, if any, of these projects. Staff personnel testified that they were pressured by Moody to skirt traditional accounting practices. Thus, the staff never realized, until too late, that as these bogus projects secured installment financing, Pabst and Beaudreau stripped most of the funds from the nominal recipients—Carlson, Earl, and Hamilton—under the pretense that a redistribution of these grants to the CIJL was directed by Moody.

Moody's stewardship of the Foundation, already tenuous, became increasingly so with the enlistment of former Congressman Robert Bauman, purportedly to provide legal services to Moody and to build a Washington-based CIJL power network. Moody allegedly agreed to channel Bauman's remuneration through two tax-exempt organizations, created expressly for that illicit purpose and funded from Foundation grants. The two entities were euphemistically styled the Foundation for Education on Free Enterprise (FEFE) and the Texas Civil Liberties Foundation (TCLF).

Bauman testified that he submitted grant proposals on behalf of both organizations to the Foundation and received funding of $225,000 and $250,000, respectively. Bauman also stated that he received compensation of at least $15,000 from the CIJL for legal services rendered on behalf of Moody. These activities, however, were the subject of a separate indictment for bankruptcy fraud.

---

**2.** *See supra* note 1.

The CIJL's corrupt network began to unravel shortly after Pabst's 1985 conviction in state court for defrauding another charitable trust, the ARCO Foundation, predictably by the same mechanism of securing bogus grants through fictitious subsidiary foundations. Thereafter, the Foundation staff learned that at least three of its grantees were affiliated with the CIJL, that grant funds had been redirected to the CIJL in contravention of enumerated restrictions, and that the book, dental, and jury projects promoted by Moody were scams.

### B.

A federal grand jury indicted Moody, Pabst, Beaudreau, and several confederates on numerous counts of mail and wire fraud. Pabst and Beaudreau promptly fled the jurisdiction and remained at large during the trial. Moody, however, was convicted on seventeen counts of fraud or aiding and abetting such fraud. The court sentenced him to five years' imprisonment, five years' probation, and 200 hours' community service and ordered him to pay $500,000 in fines as well as $1.3 million in restitution to the Foundation.

### C.

Moody raises a series of challenges on appeal, each designed to show that he was denied a fair trial. Principally, he insists that his right to confront adversarial testimony was overly restricted by the district court and that he was denied an opportunity to frame his defensive theory. The thrust of his proffered testimony, we are told, would have shown that Moody was but one in a long list of victims deceived by Pabst (a fugitive) and his cohorts.

That being so, the defense sought to present medical evidence to the effect that Moody was incapable of framing the specific intent necessary to defraud because of degenerative physical and psychological infirmities. Further, the defense wished to portray Moody as unusually susceptible to manipulation by CIJL adherents because of his sincere belief that he had suffered unjustly in the Alabama insurance case. To portray Moody as a victim, the defense sought to explore at length Pabst's and CIJL's sordid history of fraud as well as the events surrounding the Alabama insurance case. This tactic, it was hoped, would demonstrate that Pabst was especially adept at misleading people and that Moody was especially naive. The district court excluded much of this evidence as being irrelevant regarding Moody's culpability.

The government maintains that any evidence denied admission was either properly excluded under the rules of evidence or admitted elsewhere during the trial. Accordingly, Moody was not denied an opportunity to frame his defense or confront his accusers. Further, expert medical testimony concerning Moody's mental capacity was belatedly raised or, alternatively, barred by the Insanity Reform Act of 1984, 18 U.S.C. § 17.

### II.

### A.

The admission or exclusion of evidence at trial is a matter committed to the discretion of the trial court. Accordingly, we review the evidentiary rulings of the court only for abuse of its discretion. *United States v. Jimenez Lopez*, 873 F.2d 769, 771 (5th Cir. 1989). Further, "even if abuse of discretion in the admission or exclusion of evidence is found, the error is reviewed under the harmless error doctrine." *Id.*

Moody complains that the district court erred in prohibiting detailed testimony concerning the character of Pabst, Beaudreau, CIJL employees, and CIJL's heritage of deception as witnessed by a government agent who had infiltrated the organization. That testimony would have touched upon the peculiar personalities and activities of individual CIJL adherents (especially Pabst), the continuing state and federal investigations pertaining to the CIJL, and the organization's structure, fraudulent tax practices, clientele, and marketing. However, as neither the CIJL nor its employees were on trial here, the court held much of this evidence to be irrelevant for purposes of maintaining Moody's innocence.

Moody persists, however, that such evidence is relevant for purposes of negating any specific intent on his part to defraud the Foundation. A detailed development of the CIJL's organizational network, practices, and employees is needed, we are told, to frame Moody's defensive theory that he unwittingly became a participant in a sophisticated scam and a puppet in the eccentric causes that Pabst promoted.

The government does not argue that the CIJL's activities are completely irrelevant. Rather, it claims that sufficient evidence regarding the CIJL and its adherents was presented to the jury such that no rational juror could have been misled about the contemptuousness of the organization or its leaders. The government emphasizes that testimony was adduced regarding, among other things, CIJL's tax-avoidance schemes, Pabst's charlatan nature and conviction for defrauding the ARCO Foundation, and Beaudreau's impersonation of a federal law enforcement officer.

▮ We agree with the government that while the sordid nature of the CIJL and its adherents is relevant to Moody's defense, the incorrigibility of the organization cannot overshadow the prosecution of this defendant. The district court properly focused the inquiry upon *Moody's relationship* with the CIJL and rebuked attempts by defense counsel to convert the trial into an inquisition of the CIJL and its followers.

The defense does not have a license to delve into every activity of an organization, or its adherents, under the pretense that it is probative of the criminal intent of the accused or necessary for impeachment purposes. Such activities may be, as here, tangential to the charges levied against the defendant. In this case, for example, the government infiltrator's testimony would have addressed, in depth, Pabst's purported arms-smuggling operations in Central America for the CIA, the CIJL's past ties with the Posse Comitatus, and Beaudreau's alleged affiliation with G. Gordon Liddy and the Ku Klux Klan.

With little difficulty, we conclude that such testimony is not probative of Moody's culpability, or lack thereof, in siphoning money from the charitable Foundation. Further, some of this evidence predates Moody's involvement with the CIJL. The district court properly thwarted the defense's camouflaged effort to transform the proceedings into a vilification of Pabst, Beaudreau, and the CIJL, *in absentia,* thereby shifting the focus from Moody and onto those "incorrigible souls" at the CIJL.

We have no quarrel with excluding the soiled histories of the CIJL or the Alabama insurance case under either Fed.R.Evid. 401 or 403, as such evidence is irrelevant or potentially misleading concerning the precise issue of Moody's culpability in defrauding the Foundation. With two notable exceptions, we thus find no reversible error in the court's evidentiary rulings in this complicated case.[3] We depart with the court, first, in barring Moody from impeaching the veracity of Pabst and Beaudreau, although both effectively "testified" by means of hearsay declarations, and, second, in denying surrebuttal testimony regarding the bankruptcy fraud raised by the former congressman during rebuttal.

B.

In its case-in-chief, the government relied extensively upon the inculpatory hearsay remarks of Pabst, Beaudreau, and other nontestifying declarants to impute Moody's alleged intentional and knowing participation in the fraud on the Foundation. At the time of trial, Pabst and Beaudreau remained fugitives; nevertheless, highly incriminating remarks attributable to Moody were admitted pursuant to Fed.R.Evid. 801(d)(2)(E)'s exclusion of co-conspirators' statements from the hearsay rule.

▮ Moody's attempts to introduce evidence designed to impeach these hearsay

---

**3.** The defense, admittedly, filed notice beyond the time limit allowed by Fed.R.Crim.P. 12.2(b) to present expert psychiatric testimony on behalf of Moody (must be filed before deadline set for pretrial motions). It also failed to show cause for the delay. Accordingly, we decline to consider the issue of whether the Insanity Reform Act bars medical testimony addressing the defendant's mens rea in the specific-intent crimes charged here.

declarants' reputation for truthfulness was barred, at the government's urging, under the misconception that the veracity of out-of-court declarants is not impeachable. For example, during the testimony of former CIJL employee Nancy Wilson, the following exchange took place:

> Defense attorney: Do you [Wilson] have an opinion as to the character and reputation for truthfulness or untruthfulness of William Pabst?
>
> Witness: Well—
>
> Government attorney: Your Honor, I am going to object. I don't think there is any occasion for this testimony.
>
> The Court: I sustain the objection.
>
> Defense attorney: Your Honor, there has been numerous statements made by Government—
>
> The Court: I sustained the objection.
>
> Defense attorney: You refuse to hear my argument on it?
>
> The Court: I sustained the objection.

In a subsequent bench conference, Moody's attorney persisted that she wished to elicit the opinion of the former CIJL employee regarding Pabst's and Beaudreau's veracity:

> Defense attorney: I want to ask [Wilson] what her opinion is in regards to his [sic] character for truthfulness or untruthfulness of Pabst and Beaudreau. We have done it in regards to Holloway.
>
> The Court: There is a big difference. Holloway testified.
>
> Defense attorney: Correct, your Honor. But you've allowed hearsay declarations on the part of Beaudreau and Pabst repeated [sic] on Government direct. Numerous witnesses have testified in regards to statements that Beaudreau's [sic] allegedly made and that Pabst has allegedly made in regards to Shearn Moody. Those witnesses are not available for cross examination. You allowed that testimony in.

So at this time we have the right to attack the credibility of the hearsay declarations.

. . . . .

> Government attorney: Well, your Honor, it is my recollection of the rule, although I don't have it square in front of me, that only—reputation for truthfulness and so forth can only be introduced after the credibility or character of a witness for that trait has been attacked when he testified at trial. Since neither of these men testified, it doesn't fall within the rule, and there is no occasion for eliciting that testimony.
>
> Court: I agree....

Accordingly, the veracity of Pabst and Beaudreau—the principal engineers of the fraud—could not be disparaged by witnesses for the defense, despite the highly incriminatory nature of their hearsay remarks. We conclude that the trial court's exclusion of such impeachment evidence was in contravention of the rules of evidence.

■ The court harbored the misconception, reinforced by the government, that hearsay declarants cannot be impeached if they fail to testify at trial. This belief is squarely contradicted by Fed.R.Evid. 806, which provides,

> When a hearsay statement, or a [co-conspirator's statement as defined in rule 801(d)(2)(E)], has been admitted in evidence, the credibility of the declarant may be attacked, and if attacked may be supported, by any evidence which would be admissible for those purposes *if declarant had testified as a witness.* [Emphasis added.]

Thus, a hearsay declarant is deemed to be a witness whose credibility is subject, in fairness, to impeachment. *United States v. Graham,* 858 F.2d 986, 990 (5th Cir.1988) (citing advisory committee notes), *cert. denied,* —— U.S. ——, 109 S.Ct. 1140, 103 L.Ed.2d 201 (1989).

Impeachment of out-of-court declarants may be accomplished, for example, by testimony of prior convictions,[4] reputation,[5] or

---

**4.** Fed.R.Evid. 609; *accord United States v. Newman,* 849 F.2d 156, 163 (5th Cir.1988).

**5.** Fed.R.Evid. 608.

prior inconsistent statements.[6] We note, however, that rule 806 is not an invitation to the defense to revisit, ad nauseam, the sordid history of the hearsay declarants in order to disparage their credibility. The scope of impeachment parallels that available if the declarant had testified in court, since rule 806 treats the physical location of the testifying declarant, for impeachment purposes, as legally insignificant. Thus, Moody is free to elicit from his in-court witnesses, especially former CIJL associates, opinion testimony to the effect that Pabst and Beaudreau had earned an abysmal reputation for truthfulness.

The government, to our dismay, fails even to acknowledge the applicability of rule 806 in this case: It does not cite the rule in its brief and, upon inquiry at oral argument, suggested passingly that Pabst's and Beaudreau's poor reputations were established by other substantive evidence at trial and that the rule was never violated. We conclude that rule 806 cannot be dispensed with so easily.

In *Delaware v. Van Arsdall*, 475 U.S. 673, 678–79, 106 S.Ct. 1431, 1434–35, 89 L.Ed.2d 674 (1986), the Court announced that the sixth amendment's confrontational guarantee includes an opportunity for effective cross-examination, to include impeaching the motivations of adversarial witnesses. While trial courts retain "wide latitude" in imposing reasonable limits upon impeachment, *see id.* at 679, 106 S.Ct. at 1435, they cannot place an out-of-court witness's reputation for truthfulness beyond the scope of inquiry.[7]

We conclude that the court's evidentiary ruling, which proscribed the impeachment of Pabst's and Beaudreau's reputations for veracity, is at odds with the confrontation clause. That being so, the constitutional inquiry advances to the next stage—appraising the quantum of harm injected into the trial, as "harmless" constitutional

breaches do not occasion reversal of convictions.

Specifically, the Supreme Court has "repeatedly reaffirmed the principle that an otherwise valid conviction should not be set aside if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt." *Van Arsdall, id.* at 681, 106 S.Ct. at 1436 (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Factors to be considered in this harmless-error inquiry include the importance of the out-of-court testimony to the government's case, whether the hearsay was merely cumulative, the presence or absence of material evidence contradicting the testimony of the absent witnesses, the extent of cross-examination otherwise effected, and the overall strength of the prosecution's case. *See id.* 475 U.S. at 684, 106 S.Ct. at 1438.

We cannot conclude from our review of this extensive record that the confrontational error in this case was harmless beyond a reasonable doubt. The strength of the government's case, undisputably, depended heavily upon the inculpatory hearsay remarks attributable to Pabst and Beaudreau, both of whom engineered this criminal enterprise. Further, such hearsay was essential to the government in maintaining before the trier of fact that Moody possessed the requisite *mens rea* to commit the specific-intent crimes charged.

We doubt that the jury enjoyed a fully informed appraisal of the untruthfulness of these "testifying" fugitives, especially as witnessed by CIJL associates closest to them. The fact that the substantive evidence may have reflected poorly upon Pabst and Beaudreau is not necessarily equivalent, in a confrontational sense, to having former coworkers disparage the reputation for honesty of these important government witnesses. Our lack of confi-

---

6. Fed.R.Evid. 613(b); accord *Graham,* 858 F.2d at 990.

7. We have stated, "While it is within the discretionary authority of the trial court to limit cross-examination, that authority 'comes into play only after there has been permitted as a

matter of right sufficient cross-examination to satisfy the Sixth Amendment.'" *United States v. Garza,* 754 F.2d 1202, 1206 (5th Cir.1985) (quoting *United States v. Mayer,* 556 F.2d 245, 250 (5th Cir.1977)).

dence in the harmlessness of this error is exacerbated by the government's failure to acknowledge or address this obvious confrontation-clause defect on appeal.

### C.

Moody further asserts that his confrontational guarantee was abridged with respect to the rebuttal testimony of former congressman Bauman. During the government's case-in-chief, the defense successfully excluded evidence regarding the channeling of Foundation grants through FEFE and TCLF to Bauman and Moody's other bankruptcy attorneys as remuneration. The defense charged that such extrinsic bad-act evidence was barred by Fed.R.Evid. 404(b) and offered by the government principally to soil Moody's character.

The grants to Bauman were the subject of a separate indictment, yet the government sought to introduce evidence of the events surrounding this bankruptcy fraud to prove that Moody shared the same intent or plan with respect to the various CIJL-subsidiary grants at issue in this case. The court consistently adhered to its ruling throughout the government's case-in-chief that the fraudulent events charged in the separate indictment were not admissible under rule 404(b) to show Moody's predilection to defraud the Foundation here. However, the court reversed itself during the government's rebuttal, permitting Bauman to testify about the events charged in the separate indictment and Moody's alleged misdirection of Foundation grants through bogus foundations to compensate his bankruptcy attorneys.

The defense objected, without success, to Bauman's rebuttal and moved that the court allow a continuance so that the defense could muster surrebuttal witnesses. In denying surrebuttal to Bauman's testimony, the court engaged in the following dialogue:

Government attorney: If I may, Your Honor, I am not unaware [sic] of anything that allows the defense to put on a rebuttal to the government's rebuttal.

Defense attorney: Your Honor, this evidence has never been presented before.

How could we contemplate that the government would seek to put this on and the Court would allow it, Your Honor?

The Court: Well [counsel], that is what rebuttal is all about. There is no surrebuttal. And so you don't have to worry about a delay.

Defense attorney: Your Honor, how could we know that the government was going to put on this evidence? ... [T]he Court had ruled previously in connection with this testimony ... that the government was not going to be permitted to go into those matters. How could we presuppose those things, Your Honor? The government did not put it on in its direct presentation of evidence in this case.

The Court: What is your defense in this case?

Defense attorney: Your Honor, our defense in this case is that Mr. Moody did not intentionally or knowingly participate in any of this. That this was Mr. Pabst's doing.

The Court: Okay. And you had all these people come up here and testify, oh, he just was a follower.... [H]e just didn't know what he was doing. He didn't have the capacity to form the intent, as I believe you've said it many times. Well, this goes directly in rebuttal to that....

■ The government argues that Bauman's rebuttal testimony was properly admitted, which, *arguendo*, we accept as true. However, it is undisputed that Moody objected to Bauman's rebuttal and was never afforded an opportunity to confront this testimony with surrebuttal evidence. The court erroneously concluded, again at the government's behest, that surrebuttal is entirely unavailable to confront government rebuttal. That being so, we must address whether this denial of surrebuttal, premised upon a misunderstanding of the applicable law, is nevertheless harmless error.

The decision to permit surrebuttal falls within the discretion of the trial court, which we review only for abuse. *See United States v. Winkle*, 587 F.2d 705, 712 (5th Cir.), *cert. denied*, 444 U.S. 827, 100 S.Ct.

51, 62 L.Ed.2d 34 (1979); *Turner v. United States*, 441 F.2d 736, 739 (5th Cir.1971). Our caselaw instructs that surrebuttal is merited where (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case, and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony. *See United States v. Durnin*, 632 F.2d 1297, 1301 n. 8 (5th Cir. Unit A 1980); *Winkle*, 587 F.2d at 712; *United States v. Doe*, 488 F.2d 93, 94 (5th Cir.1973), *cert. denied*, 416 U.S. 991, 94 S.Ct. 2400, 40 L.Ed.2d 769 (1974).

■ The government argues that no new issue was raised during Bauman's rebuttal testimony, as it had charged throughout this trial that Moody secured fraudulent Foundation grants for his own benefit. But the government ignores the fact that the transactions involving Bauman were the subject of an independent indictment for bankruptcy fraud, separately prosecuted at the government's express request.

We reject as meritless the government's response that the scope of its case against Moody was not broadened by Bauman's testimony. His testimony addressed Moody's direct involvement in the TCLF and FEFE and, further, informed the jury that those entities provided a circuitous path by which Moody could secure legal services from Bauman and other bankruptcy counsel. Such activity is punishable separately from the grants to Earl, Carlson, and Hamilton.

There is also an element of unfair surprise in the court's belated reversal concerning Bauman's testimony. Having ruled earlier during government direct that Bauman's testimony concerning the TCLF and FEFE was precluded, the defense was justified in believing that it did not need to confront Moody's alleged involvement with those bogus organizations. By reversing its earlier ruling, however, the district court was obliged to provide Moody an opportunity for surrebuttal, assuming of course that the defense could proffer evidence to parry the expanded government case.

Indisputably, Bauman's rebuttal testimony significantly reinforced the government's theory that Moody profited personally from the Moody Foundation, maintaining that he had engaged in a separate fraud before the bankruptcy court. In response, the defense proffered the surrebuttal testimony of Moody's brother, who would have testified to the effect that Bauman had made prior inconsistent statements concerning Moody's involvement with the TCLF and FEFE grants. The defense also proffered the testimony of Moody's bankruptcy counsel, allegedly paid by Foundation grants, who would have testified that they were paid properly and had witnessed no bankruptcy fraud.

We conclude that Bauman's rebuttal testimony expanded the government's case into the realm of bankruptcy fraud and, further, that Moody proffered sufficient surrebuttal testimony to confront directly Bauman's new charges with respect to FEFE and TCLF. The denial of surrebuttal in this case constitutes another breach of the sixth amendment's confrontational guarantee, meriting reversal if not "harmless."

There is little dispute that the testimony of the former congressman was highly detrimental to Moody. That being so, we cannot state, beyond a reasonable doubt, that the denial of surrebuttal to confront the expanded government case was inconsequential under the standard announced in *Van Arsdall.* These confrontational errors, at least in the aggregate, require reversal.

### III.

A reversal for trial error does not immunize a criminal defendant from reprosecution. *United States v. Tateo*, 377 U.S. 463, 465, 84 S.Ct. 1587, 1588, 12 L.Ed.2d 448 (1964). A reversal for evidentiary insufficiency, however, conclusively establishes that the government has failed to carry its burden of proof. That being so, the double jeopardy clause bars retrials on charges for which the prosecution failed to

muster sufficient evidence at the initial proceeding. *Burks v. United States,* 437 U.S. 1, 15–16, 98 S.Ct. 2141, 2149–2150, 57 L.Ed.2d 1 (1978).

We review the sufficiency of the evidence in a light most favorable to the government, and we draw all reasonable inferences and credibility choices in favor of the verdict. *United States v. Rochester,* 898 F.2d 971, 976 (5th Cir.1990); *United States v. Long,* 894 F.2d 101, 108 (5th Cir.1990). "If the evidence, when viewed in this light, is such that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, this Court must affirm." *Rochester,* 898 F.2d at 976 (citing *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)).

■ Moody objects to his conviction on the basis that the government failed to present sufficient requisite evidence of the crimes charged. He correctly argues that to establish a violation of the mail fraud statute, 18 U.S.C. § 1341, the government must prove, among other elements, the use of the United States mails for the purpose of executing the fraudulent scheme.[8] Similarly, to prevail on a charge of wire fraud, 18 U.S.C. § 1343, the government must demonstrate the use of interstate wire communications to effect the alleged artifice. *United States v. Herron,* 825 F.2d 50, 53–54 (5th Cir.1987). According to Moody, the prosecution failed to satisfy the mailing or wire-transmission requirement in various counts of the indictment.

Each separate use of the mails or interstate wire communications to further a scheme to defraud is punishable independently. *United States v. McClelland,* 868 F.2d 704, 706 (5th Cir.1989) (mail fraud); *Henderson v. United States,* 425 F.2d 134, 138 n. 4 (5th Cir.1970) (wire fraud). Significantly, the mailing or wire-transmission requirement may be established by circumstantial evidence, such as customary business practices. *See United States v. Bowman,* 783 F.2d 1192, 1197 (5th Cir.1986);

*United States v. Goss,* 650 F.2d 1336, 1343 (5th Cir. Unit A July 1981).

The exclusive reliance upon circumstantial evidence, however, does not relieve the government of its burden to demonstrate to the jury the use of United States mails (or interstate wire communications) beyond a reasonable doubt. *See United States v. Massey,* 827 F.2d 995, 999 (5th Cir.1987). Where, for example, the usual business practice includes the frequent use of private couriers or other methods of correspondence, the inference that United States mails (or wire communications) were employed in executing the fraud is cast into serious doubt. Absent other probative evidence to show that a mailing or wire-transmission occurred, such as date-stamping of letters or telephone records, a jury cannot reasonably overcome the presumption of innocence. *See Massey, id.* at 1000.

In the instant case, Foundation employees testified that their customary business practice included date-stamping correspondence received through the mail. Additionally, testimony was adduced indicating that at least 97 percent of all written communications to the Foundation were received by mail. There was some conflicting testimony, however, suggesting that mail-stamping may not have been followed religiously by the staff, but we have determined previously that occasional departures from the norm do not necessarily render otherwise probative evidence of business practice legally insufficient. *See Goss,* 650 F.2d at 1343 n. 4.

The defense, to its detriment, produced no testimony demonstrating that private delivery services, to be distinguished from the United States mails, were employed in this case. Such evidence would have aided Moody in casting doubt upon the method of delivery. Further, the government occasionally emphasized the time delay of delivery, as evidenced by the postal date of deposit and the Foundation's stamped date of receipt, to imply delivery by mail, since a three- or four-day delivery delay is in ac-

---

8. *See Rochester,* 898 F.2d at 976; *United States v. Helms,* 897 F.2d 1293, 1296 (5th Cir.1990); *United States v. Aubrey,* 878 F.2d 825, 827 (5th Cir.), *cert. denied,* —— U.S. ——, 110 S.Ct. 289, 107 L.Ed.2d 269 (1989).

cordance with the ordinary degree of postal efficiency. We agree with the government that delivery delays, or the lack thereof, may be probative of the method of transport.

Moody expressly challenges only six of the seventeen counts in the indictment for evidentiary insufficiency. Counts 2 and 17 involve wire fraud; counts 3, 10, 11, and 14 allege mail fraud. We conclude that the circumstantial evidence of the Foundation's business practices—including the 97–percent mailing rate and practice of date-stamping—offers sufficient circumstantial evidence for a jury reasonably to deduce that the United States mails had been employed for the purpose of defrauding the Foundation as charged in counts 11 and 14.

Specifically, count 11 involves an Earl Foundation letter that was expressly date-stamped upon receipt by the Foundation. Earl also testified repeatedly that he mailed quarterly reports and correspondence to the Foundation. Count 14, by comparison, involves a Hamilton Law Institute letter to the Foundation that was similarly date-stamped and delayed by five days in transit to the Foundation. There, the sender testified that he "believed" that either he or an associate mailed the letter, but he was not completely certain. We conclude that the Foundation's customary business practice, coupled with each letter-sender's testimony when weighed most favorably to the government, indicates that the evidence was sufficient as to counts 11 and 14.

■ The wire fraud charged in count 2 involves a December 5, 1984, telephone communication between Moody in Washington, D.C., and a Foundation staff member in Galveston, Texas. During that conversation, Moody directed an installment payment to be advanced to the bogus Carlson Foundation. The government produced hotel bills reflecting that Moody was in Washington on the relevant date. It also introduced the testimony of the Foundation employee, MacDonald, with whom Moody consulted on the telephone for purposes of securing release of the installment payment.

MacDonald testified that he had talked with Moody by telephone on separate occasions about the Carlson Foundation, in November and December 1984, and that he had delivered documents to Moody in Washington that December. MacDonald further maintained that he talked with Moody on December 5, 1984, the date charged in the indictment, and was directed by the defendant to dispense funds to the Carlson Foundation. We conclude that this evidence is legally sufficient to demonstrate the use of interstate wire communications in furtherance of the fraud charged in count 2.

Oddly, the government has selected not to address the evidentiary sufficiency of count 17. The indictment indicates, however, that on October 9, 1985, Moody telephoned the Foundation—again from Washington, D.C.—to instruct that funds be dispersed to the Hamilton Law Institute. As a consequence of that conversation, a large installment payment was released by the Foundation.

We reject Moody's argument that the government, by electing to remain mute on count 17, conceded that count's evidentiary insufficiency. The burden rests squarely with the defendant on appeal to demonstrate such insufficiency, despite government silence. We remind the government, however, that it is ethically bound to concede a challenge where, in good faith, the direct and circumstantial evidence that it produced at trial cannot legally support a conviction.

Absent an express concession by the government concerning the insufficiency of the evidence, or in the event of silence, we remain obligated to scrutinize the relevant portions of the trial record—albeit somewhat myopically—to survey the measure of evidentiary sufficiency. We express the caveat that our unaided appellate review of lengthy records such as this is not the preferred practice and that the government properly assumes the risk where it elects not to direct us to evidence that supports its position.

As with rule 806, discussed *supra*, the government suffers from selective amnesia with respect to the issue of count 17's

evidentiary sufficiency. We nevertheless have scrutinized this extensive record, particularly the testimony of Foundation employee MacDonald, who testified that Moody directed him by telephone on October 9, 1985, to disperse the last Foundation installment to the Hamilton Law Institute. Washington-based hotel bills and phone records admitted into evidence reinforce the charge that Moody employed interstate wire communications on the relevant date to secure the release of Foundation grants. Viewing this evidence, as we must, most favorably to the government, we affirm the sufficiency of the evidence with respect to count 17's wire-transmission requirement.

We agree with the defense, however, that the convictions with respect to counts 3 and 10 must be set aside. These counts involve Foundation correspondence directed to the Earl Foundation. Unlike the remaining mail-fraud counts, these two charges involve the dispatching—as opposed to the receipt—of letters by the Foundation.

■ The government concedes that no direct evidence was adduced to show that these letters were transmitted by the United States Postal Service. The testimony elicited from clerical employees concerning the Foundation's customary business practices focused extensively upon *incoming* mail handling. Further, there is a dearth of circumstantial evidence to identify the precise mechanism by which Earl received the Foundation's correspondence, and Earl's testimony never addressed how the Foundation's letters at issue were received. Speculation concerning such a material element is not sufficient to sustain a conviction. Therefore, we hold that the government failed to carry its burden of proof in demonstrating the use of the mails in furtherance of the fraud charged in counts 3 and 10.

Accordingly, the conviction is REVERSED, and the case is REMANDED. Any reprosecution of this defendant must exclude counts 3 and 10 of the amended indictment.