**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 7, 2012

No. 10-60917

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

ANTONIO TURNER,

Defendant–Appellant.

Appeal from the United States District Court
for the Southern District of Mississippi

Before CLEMENT, OWEN, and HIGGINSON, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Antonio Turner was convicted of robbery in interference with interstate commerce, carjacking, the use of a firearm in relation to each of those offenses, and being a felon in possession of a firearm. Turner asserts eleven claims of error. We affirm the judgment of the district court.

**I**

Two masked men armed with handguns robbed Title & Payday Loans (Title Loans) in Jackson, Mississippi. No shots were fired during the two-minute robbery, which was captured on the business's security camera. According to a videotaped confession by Antonio Turner, he was one of the robbers and

No. 10-60917

Cornelius Black was the other.  Turner has asserted, both below and on appeal, that his confession was unlawfully coerced through violence, threats, and promises.

The same day of and shortly after the Title Loans robbery, a Popeyes restaurant in Jackson was also robbed.  As the perpetrators fled the scene, Officer Dewayne Collier of the Jackson Police Department gave chase until the getaway car crashed, at which point one of the robbers (Turner, according to his confession) began firing at Officer Collier, who was in his patrol car, wounding him in the neck.  The shooter then stole the patrol car and fled.  The patrol vehicle was found abandoned on Norman Street, where a police officer saw an unidentified person running into the woods.  Turner was arrested near the same woods later that day.  Cornelius Black was arrested near the scene of the shooting.

Turner was tried on charges of robbery in interference with interstate commerce (the Title Loans robbery) (in violation of 18 U.S.C. § 1951), use of a firearm in relation to a crime of violence (robbery) (in violation of 18 U.S.C. § 924(c)(1) and (2)), carjacking resulting in injury (in violation of 18 U.S.C. § 2119), use of a firearm in relation to a crime of violence (carjacking) (in violation of 18 U.S.C. § 924(c)(1)), and being a felon in possession of a firearm (in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2)).  The jury convicted him of robbery, use of a firearm in relation to robbery, and being a felon in possession, but the jury was unable to reach a verdict on the charges of carjacking and use of a firearm during a carjacking.  In a subsequent retrial, Turner was convicted of the latter two offenses.

In this appeal, Turner challenges his convictions on all five counts as well as his sentence.  Because Turner was not sentenced for any of his convictions

2

No. 10-60917

until after his second trial, all of his claims of error relating to both trials are properly before this court at this time.[1]

## II

Turner first asserts that the district court erred by denying his motion for a new trial on the robbery counts and the felon-in-possession count in light of evidence that had been lost at the Jackson Police Department and not found until after the first trial. Once he became aware of the new evidence, Turner moved for a new trial on two alternative grounds: as a result of newly discovered evidence under Federal Rule of Criminal Procedure 33 and based on a violation of the *Brady* rule.[2]

Turner's defense during both trials was that he was one of three men involved in the crimes but that he did not personally rob Title Loans or shoot Officer Collier. He asserts that evidence discovered after his first trial supports this defense. The primary new evidence at issue was contained in two brown paper grocery bags discovered behind a cubicle at the Jackson Police Department. One of the bags held a pair of blue denim jeans, a white tank-top style T-shirt, a pair of white Reebok athletic shoes, a black knit style "do-rag," and a cellular telephone. Because the contents were similar to what Turner had been wearing when he was arrested, this bag was labeled "Antonio Turner" by the officer who found it. The other bag contained two pairs of black tennis shoes, a cellular telephone, white footies, and $316 in cash. Because it was found alongside what was thought to be Turner's clothing, this bag was labeled "Cornelius Black" by the officer.

All these items were tested for blood and DNA. None was found on one of the phones, however, blood or DNA was found on several items. Blood on the

---

[1] *See Berman v. United States*, 302 U.S. 211, 212 (1937) (holding that the final judgment in a criminal case is the sentence).

[2] *See Brady v. Maryland*, 373 U.S. 83 (1963).

No. 10-60917

white tank-top matched Turner's DNA, but blood on the jeans was from an unknown woman. DNA recovered from the white Reebok athletic shoes and one of the cellular phones did not match Turner's, Black's, or Collier's DNA. DNA from the black tennis shoes came from two individuals, one of whom was Collier, but the identity of the other person was unknown. In sum, the evidence indicated that DNA on some of the items came from two different individuals, one of whom was female, and the other of whom was not Turner, Black, or Collier.

In his Rule 33 motion, Turner also cites as new evidence a police interview conducted after the first trial with Jim Vlach, who told police that, around the time and place of the robbery, he "saw two vehicles speed past his business" with police cars in pursuit. Turner also points to a fingerprint and palm-print analysis, performed after the first trial, of Officer Collier's patrol car. This analysis found Officer Collier's prints on the vehicle, but it did not find prints from Turner.

Turner asserts that the existence of the third pair of shoes found in one of the paper bags discovered after the first trial supports his version of events. He also points to the bloody tank-top as evidence that he was beaten by the police to coerce a confession.

## A

In *Brady v. Maryland*, the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."[3] Turner contends that the evidence discovered after his first trial entitles him to a new trial on the counts for which he was convicted in the first trial. We review the denial of a

---

[3] *Id.* at 87.

No. 10-60917

motion for a new trial for abuse of discretion but consider alleged *Brady* violations de novo.[4]  This de novo review "must proceed with deference to the factual findings underlying the district court's decision."[5]

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[6]  "Reasonable probability" means "a probability sufficient to undermine confidence in the outcome."[7]

The evidence here does not meet this standard.  It is unlikely Turner's confession would have been deemed coerced based on the finding of his blood on the tank-top when he had been involved in at least one car accident on the same day and when the determination of a lack of coercion involved numerous other factors.  The jury heard a great deal of evidence implicating Turner, including his confession.  The third pair of shoes, with no chain of custody and no certain tie to the case, and the bloody tank top, both found in a bag in a police station, might have slightly bolstered Turner's arguments had he had access to them.  But this possibility is insufficient to  undermine our confidence in the outcome of his first trial when these items were unavailable.

## B

Turner contends that he is entitled to a new trial under Federal Rule of Criminal Procedure 33, which permits a court to "vacate any judgment and grant a new trial if the interest of justice so requires."  We review a district court's

---

[4] *United States v. Severns*, 559 F.3d 274, 278 (5th Cir. 2009).

[5] *Id.* (internal quotation marks omitted).

[6] *Kyles v. Whitley*, 514 U.S. 419, 433-34 (1995) (quoting  *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.); *id.* at 685 (White, J., concurring in part and concurring in judgment)) (internal quotation marks omitted).

[7] *Bagley*, 473 U.S. at 682 (opinion of Blackmun, J.) (internal quotation marks omitted).

No. 10-60917

decision regarding a Rule 33 motion for an abuse of discretion.[8] "Such motions are disfavored and reviewed with great caution."[9] When the basis of the motion is newly discovered evidence, we apply the "*Berry* rule,"[10] under which the defendant must show

> (1) that the evidence is newly discovered and was unknown to him at the time of trial; (2) that the failure to discover the evidence was not due to his lack of diligence; (3) that the evidence is not merely cumulative, but is material; and (4) that the evidence would probably produce an acquittal.[11]

Here, the first two elements are not in dispute, as the items in the grocery bags were genuinely lost and could not have been discovered by Turner until they were found behind the cubicle. The interview with Vlach and the print analyses were not conducted until after the first trial. At issue is whether this evidence is material, not merely cumulative, and whether it would probably lead to an acquittal.

For the same reasons that we concluded that the blood on the tank-top and the third pair of shoes did not require a new trial under *Brady*, we also conclude that this evidence would not "probably produce an acquittal." The interview with Vlach was cumulative of Turner's other evidence of a third robber and would add little persuasive force to a theory the jury had considered and rejected.

The palm and fingerprint analysis that failed to find Turner's prints on Collier's patrol car is not an appropriate issue for this new-trial motion as the

---

[8] *United States v. Wall*, 389 F.3d 457, 465 (5th Cir. 2004) (citing *United States v. O'Keefe*, 128 F.3d 885, 893 (5th Cir. 1997)).

[9] *Severns*, 559 F.3d at 280 (citing *United States v. Erwin*, 277 F.3d 727, 731 (5th Cir. 2001)).

[10] *See Berry v. Georgia*, 10 Ga. 511 (1851).

[11] *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004) (quoting *United States v. Gresham*, 118 F.3d 258, 267 (5th Cir. 1997)).

No. 10-60917

analysis was performed *before* the trial that actually convicted Turner on the carjacking and related use of a firearm counts.  Turner argues that, since the court considered all of the counts "inextricably intertwined," we should consider evidence on one count relevant to all counts.  But the first jury did not convict on the carjacking counts, and Turner offers no basis upon which to conclude that presenting that same jury with evidence that might have undercut Turner's guilt on the carjacking counts would probably have led it to acquit on the robbery counts.

### III

Turner argues that the court erred by failing to grant his motion to sever the charges against him and hold three separate trials (one on the robbery and accompanying weapon count, another on the carjacking and accompanying weapon count, and a third on the felon-in-possession count).  He also asserts it was error for the district court to deny his motion to exclude evidence of the robberies from the second trial on the carjacking counts.

### A

"We review the denial of a motion for severance for abuse of discretion. We do not reverse unless there is clear prejudice to the defendant."[12]  In many instances, prejudice from failure to sever counts can be cured through an appropriate jury instruction, and we have noted that juries are presumed to follow such instructions.[13]

With respect to the robbery and carjacking counts in the first trial, the district court gave a limiting instruction identical to one that this court has

---

[12] *United States v. Hickerson*, 489 F.3d 742, 746 (5th Cir. 2007) (citations omitted) (internal quotation marks omitted) (citing *United States v. McCarter*, 316 F.3d 536, 538 (5th Cir. 2002)); *see also* FED. R. CRIM. P. 14(a).

[13] *E.g.*, *Hickerson*, 489 F.3d at 746 (citing *United States v. Bullock*, 71 F.3d 171, 175 (5th Cir. 1995)).

previously approved as curing the sort of prejudice that could occur in a case like this one—that is, the possibility that a jury might consider evidence pertaining to one count as evidence of another.[14]   Turner's purported proof that he was actually prejudiced is that the first jury failed to convict on the carjacking counts but rendered a guilty verdict on the robbery counts.  However, this tends to show that the jury *could* distinguish between the two sets of charges and did in fact follow its instructions.  Because Turner has not shown clear prejudice, the district court did not abuse its discretion in declining to sever the robbery and carjacking counts.

## B

Felon-in-possession-of-a-firearm   charges   present   special   prejudice concerns that are not reflected in the usual presumption in favor of joinder.[15]  To prosecute these charges, the Government must introduce evidence of the defendant's prior felonies, evidence that would otherwise be inadmissible in most cases.[16]  We have noted that, sometimes, not even a limiting jury instruction can cure the prejudice inherent in joining a charge of this nature.[17]   But such a charge need not always be severed.  We have permitted joinder when the weapon was found during the investigation of the other offenses charged, when the weapon might have been available for use during the other offenses, and a limiting instruction was given.[18]   We have been less inclined toward joinder when the firearm was less relevant to the other offenses, such as when it was

---

[14] *See id.*

[15] *See United States v. McCarter*, 316 F.3d 536, 538 (5th Cir. 2002).

[16] *See id.*

[17] *See id.* at 538-39.

[18] *Bullock*, 71 F.3d at 175.

found at the time of arrest, months after the other indicted crimes;[19] when the possibility of prejudice seemed especially problematic, such as when the evidence for the other crimes was "thin," though legally sufficient;[20] or when the prosecutor's motives for adding the charge seemed suspect or was merely a technique to introduce evidence of the defendant's bad character into evidence.[21]

None of these concerns applies here. In this case, the firearm was found in a police car shortly after Turner allegedly drove and wrecked that vehicle. An appropriate limiting instruction was given.[22] Most importantly, the possibility of prejudice or improper prosecutorial motive is reduced because evidence of Turner's prior felony convictions would have been relevant and admissible for other purposes, which include to explain why he would have fled from police[23] and to allow evaluation of the voluntariness of his confession in light of his past experiences with law enforcement. Because his prior conviction would have been just as admissible in the absence of joinder, Turner cannot demonstrate any additional prejudice resulting from the joinder.[24] Therefore, the district court did not abuse its discretion in failing to sever the felon-in-possession count.

## C

---

[19] *United States v. Holloway*, 1 F.3d 307, 310-11 (5th Cir. 1993).

[20] *McCarter*, 316 F.3d at 539-40.

[21] *Id.* at 540-41; *Holloway*, 1 F.3d at 310.

[22] The district court instructed the jury as follows:

> The fact that the defendant was previously found guilty of another crime does not mean that the defendant committed the crimes for which the defendant is on trial, and you must not use this prior conviction as proof of the crimes charged in this case other than as it relates to the charge in count five that he was a convicted felon in the possession of a firearm.

[23] *See* FED. R. EVID. 404(b) (evidence of prior crimes admissible to show motive).

[24] *See United States v. Park,* 531 F.2d 754, 763 (5th Cir. 1976).

No. 10-60917

Before Turner's second trial, he raised similar prejudice concerns in a motion in limine to exclude evidence of both the Title Loans and Popeyes robberies from his trial on the carjacking counts as barred by Federal Rule of Evidence 404(b). When a party has made a timely objection to the admission of evidence, we review the district court's ruling for abuse of discretion.[25] Under Rule 404(b), "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character," but such evidence may be used for other purposes, such as demonstrating motive.

The rule, however, applies only to acts *extrinsic* to the ones charged, and the rule thus does not exclude evidence of acts intrinsic to the crimes of indictment.[26] "'Other act' evidence is 'intrinsic,'" and not subject to the rule, "when the evidence of the other act and the evidence of the crime charged are 'inextricably intertwined' or both acts are part of a 'single criminal episode' or the other acts were 'necessary preliminaries' to the crime charged."[27] The district court concluded that the robberies met all of these criteria; the robberies set in motion the chain of events that the Government contends led to the carjacking. The district court did not abuse its discretion in concluding that this logical connection removed evidence of the robberies from the constraints of Rule 404(b) and in deciding that such evidence was admissible.

## IV

While in police custody, Turner confessed to the robberies and the carjacking, and that confession was videotaped. Before his first trial, he alleged

---

[25] *United States v. Westmoreland*, 841 F.2d 572, 578 (5th Cir. 1988).

[26] *See United States v. Torres*, 685 F.2d 921, 924 (5th Cir. 1982).

[27] *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (quoting *Torres*, 685 F.2d at 924).

that this confession was coerced through improper police conduct, and the district court held a suppression hearing before admitting the video. Turner asserts on appeal that the failure to suppress the confession should be reversed.

According to Turner's hearing testimony, the officer who arrested him threw him to the ground and put a knee in his back. Another officer put his foot on Turner's head and kicked him in the face, causing him to bleed from his mouth and nose. An officer told him, "You know, you f[_ _ _] with our family, we f[_ _ _] with yours," which Turner interpreted to be a threat against his mother and other family members. He also indicated that the same officer pointed his gun at him before transporting him to the police station. Several other officers also referred to Turner's mother and family, such as telling him they had spoken with his mother.

The district court made several factual findings as a result of the hearing. The court found no evidence to contradict Turner's claim that he was kicked and "treated roughly" but found that he was not seriously injured. It also found, "[a]s a question of fact," that the arrest did not affect the voluntariness of the confession, based in part on Turner's lack of a fearful demeanor on the video or any spoken indication that he was being coerced and on a waiver he signed before confessing that said he was not being coerced.

With respect to the threats alleged by Turner, the district court considered this issue to turn on credibility and credited the police officers' testimony and not Turner's based on the witnesses' demeanor in court and Turner's three prior felony convictions. The court also noted that Turner's family was discussed only "in a respectful way" during the interview and that Turner never mentioned any threats on the video. Taking all these factors together, the court did not find the allegation of threats credible.

As to the issue of interrogation tactics, the court noted Turner's "knowledge of the system" from prior offenses and his indication on the video

that he knew "the detectives were not the ones who would make the final decision" about the charges he would face, charges upon which Turner stated "he [knew] he [would] be convicted, no matter what." In light of all these findings, the district court concluded that Turner's will was not overborne.

When reviewing a motion to suppress based on live testimony at a suppression hearing, we "accept the trial court's factual findings unless clearly erroneous or influenced by an incorrect view of the law."[28] This evidence is viewed in "the light most favorable to the prevailing party."[29] We review de novo the district court's conclusions of law in evaluating the constitutionality of law enforcement conduct.[30]

To determine whether a confession was voluntary, and thus in accordance with the requirements of due process, we must evaluate "whether a defendant's will was overborne by the circumstances surrounding the giving of a confession."[31] This inquiry "takes into consideration the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation."[32] "Coercive police conduct is a necessary prerequisite to the conclusion that a confession was involuntary, and the

---

[28] *United States v. Outlaw*, 319 F.3d 701, 704 (5th Cir. 2003) (quoting *United States v. Williams*, 69 F.3d 27, 28 (5th Cir. 1995)) (internal quotation marks omitted).

[29] *United States v. Roberts*, 612 F.3d 306, 309 (quoting *United States v. Shelton*, 337 F.3d 529, 532 (5th Cir. 2003)) (internal quotation marks omitted).

[30] *Outlaw*, 319 F.3d at 704 (citing *United States v. Valadez*, 267 F.3d 395, 397 (5th Cir. 2001)).

[31] *Dickerson v. United States*, 530 U.S. 428, 434 (2000) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)) (internal quotation marks omitted).

[32] *Id.* (quoting *Schneckloth*, 412 U.S. at 226) (internal quotation marks omitted).

defendant must establish a causal link between the coercive conduct and the confession."[33]

Turner argues that the district court's credibility findings should be overturned because the interrogating officers "actually lied" on the stand about their coercive tactics. He cites Detective Clinton's testimony that first claimed Turner never complained of injury but later admitted that he had, with the detective clarifying that he meant Turner had never complained of *pain*. While this witness could undoubtedly have been more consistent, the district court would have been aware of this possible inconsistency and numerous other factors that may not be apparent from an appellate record. The possible conflict in the evidence, standing alone, is not a sufficient basis upon which to conclude that the district court clearly erred in crediting the officers' testimony.

Turner also complains that coercive promises were made to him, such as a suggestion that if he could "get it straight," he could see his four-year-old daughter's first day of school. As the district court recognized, statements such as this are "more troubling" than an offer by interviewing officers to tell the court that a defendant had cooperated. But mere promises of leniency, without more, are not sufficient to invalidate a confession as involuntary, especially when the defendant had experience with law enforcement and should have been hesitant to rely on such representations.[34] Again, the district court was required to, and did, consider the totality of the circumstances. Turner knew from past interrogations that there were limits on the authority of detectives to bring lesser charges or offer a shortened sentence. Further, Turner seemed resigned to the prospect that he would be convicted regardless of whether he confessed.

---

[33] *Carter v. Johnson,* 131 F.3d 452, 462 (5th Cir. 1997) (citing *Colorado v. Connelly*, 479 U.S. 157, 163-67 (1986)).

[34] *See United States v. Santiago*, 410 F.3d 193, 202-03 (5th Cir. 2005).

No. 10-60917

In light of these facts, the district court did not clearly err in finding that the "promises" made did not overbear Turner's will and coerce the confession.

## V

At his first trial, Turner wanted to ascertain whether testimony as to the federal charges would waive his Fifth Amendment right against self-incrimination as to the robbery of the Popeyes restaurant, for which he faced only state charges.  He asked the court for a ruling in limine on whether, if he took the stand, he would be required to answer questions about the Popeyes robbery.  Because such testimony would be relevant and "probative of a number of things," including "intent, identity, motive, plan, knowledge, [and] modus operandi," as well as the credibility of Turner and Cornelius Black, the court ruled that Turner could be cross-examined on that subject.  Turner did not testify, and he now asserts that this ruling was in error and should lead to reversal.

The Supreme Court held in *Luce v. United States* that a defendant who did not testify had not preserved for appellate review his objection to a district court ruling on a motion in limine that the prosecution could use a prior conviction to impeach the defendant if he were to testify (pursuant to Federal Rule of Evidence 609(a)).[35]  That was because any determination of harm that flowed from the defendant's failure to testify would be inherently speculative, as a reviewing court cannot know what the defendant would have said, how prejudicial the impeachment would have been, or if the prosecution would have used the conviction at all.[36]  The court cannot know, with certainty, why the

---

[35] 469 U.S. 38, 42-43 (1984).

[36] *Id.* at 41-42.

14

defendant did not testify.[37]   Finally, the reviewing court cannot assess the harmlessness of the error, making almost any error an "automatic reversal."[38]

We have previously recognized that the logic of *Luce* is not limited to the Rule 609(a) context, and other courts have agreed.[39]  In *United States v. Nivica*, a case very much like this one, the First Circuit rejected a non-testifying defendant's appeal of the denial of a motion in limine to limit the scope of cross-examination to issues of his choosing.[40]  The court observed that without the defendant testifying, whether with or without the jury present, there was no way of knowing how the testimony would have progressed and, therefore, how objectionable the Government's cross-examination would have been or whether the trial court ultimately would have limited the subjects covered.[41]  Finding all of the Supreme Court's concerns in *Luce* to be present, the court held that the ruling on the motion in limine was unreviewable.[42]

Similarly, without any record of what Turner would have said, this court cannot review the relevance and appropriateness of a hypothetical cross-examination on a particular subject.  As in *Nivica*, Turner's claim is unreviewable.

## VI

Turner next challenges his conviction on the ground that the jury venire for his second trial was unfairly prejudiced by hearing and seeing handcuffs as

---

[37] *See id.* at 42.

[38] *Id.*

[39] *See United States v. Bond*, 87 F.3d 695, 700 & n.2 (5th Cir. 1996) (collecting cases from other circuits extending *Luce*).

[40] 887 F.2d 1110, 1116-17 (1st Cir. 1989).

[41] *Id.*

[42] *Id.*

No. 10-60917

a deputy United States Marshal returned Turner to the courtroom after a recess in jury selection concluded. Before entering the courtroom, the marshal removed Turner's handcuffs in the hallway. As the men entered, however, the handcuffs made a clicking noise as the marshal folded them together, apparently while shifting them from his left side to his right. Defense counsel asserted to the district court that she noticed the noise, turned to the marshal, and said the marshal's name. Defense counsel noticed the matte black handcuffs were spread apart in view of the potential jurors, though the marshal quickly hid them in his hand. The marshal, for his part, did not seem to think the jury could have seen or heard the handcuffs. There is no indication that the potential jurors were polled as to whether they saw or heard anything. Turner's motion for a mistrial was denied because the district court concluded the venire would not have seen Turner shackled and did not find sufficient prejudice to Turner from the event. We review the denial of a motion for mistrial for abuse of discretion.[43]

Turner argues that this case should be controlled by our law governing the shackling of defendants before the jury in open court. We have acknowledged the "inherently prejudicial" nature of shackling, which "undermines the presumption of innocence," and we have repeated the Supreme Court's requirement that trial courts determine that visible shackles be justified by a "state interest specific to a particular trial."[44]

Turner was not forced to wear shackles before the jury; here, the jury only saw or heard, at most, an inadvertent display or click. A closer parallel to the facts of this case is *United States v. Diecidue*, in which jurors and prospective jurors had several encounters with defendants being led into the courtroom by

---

[43] *United States v. Jimenez*, 509 F.3d 682, 691 (5th Cir. 2007).

[44] *United States v. Banegas*, 600 F.3d 342, 345 (5th Cir. 2010) (internal quotation marks omitted).

marshals or wearing handcuffs outside the courthouse.[45] We nonetheless stated that "brief and inadvertent exposure to jurors of defendants in handcuffs is not so inherently prejudicial as to require a mistrial"; in such cases, "defendants bear the burden of affirmatively demonstrating prejudice," which we refused to infer from "isolated incidents."[46]

Governing this case by that standard, Turner must demonstrate prejudice. He has not attempted to do so and likely could not. Turner was never seen by the potential jurors actually *wearing* handcuffs as the *Diecidue* defendants had been. Even the "click" may not have been heard or noticed by any jurors. The possible awareness that a defendant in a violent-crime case awaits trial in jail is not the same type of prejudice faced by a defendant who sits in shackles or leg irons in front of the jury that will decide his fate. Any slight prejudice here seems highly unlikely to have affected the verdict and is insufficient to justify a new trial.

## VII

Turner asserts that the district court erred by denying his *Batson v. Kentucky*[47] challenge to the Government's peremptory strike of a potential juror. At his second trial, the Government exercised one of its strikes against a black woman, the first black person to have been considered for the panel. The potential juror had apparently said nothing during voir dire other than introducing herself at the outset of proceedings. Turner challenged the strike under *Batson*, which provides the procedure for analyzing peremptory strikes that a defendant claims are illegally based on race.[48]

---

[45] 603 F.2d 535, 549 (5th Cir. 1979).

[46] *Id.*

[47] 476 U.S. 79 (1986).

[48] *Id.* at 93-98.

No. 10-60917

Under *Batson*, when the defendant has made a prima facie showing of discriminatory jury selection, the Government then bears the burden of providing a race-neutral explanation for the strike.[49]  After Turner objected to the strike, the Government responded that it had used its first strike on a white male and gave several reasons for striking the black female juror.  The prosecutor noted that the potential juror was a single mother of three.  Though she said she was a certified nursing assistant, she indicated on a court-provided form that her employer was "unknown."  Finally, the prosecutor pointed out that the juror "kept looking at the defendant" during the voir dire.

Turner disputed—and continues to dispute—this last point, asserting that the layout of the courtroom where voir dire was held forces all jurors to look at the defendant.  Apparently, the jury box in this courtroom faces the defense table (rather than the traditional arrangement of the two being at a ninety-degree angle).  But the prosecutor contended that "this particular juror, among all of them that were sitting in the jury box area, would consistently look over at the defendant and just stare at the defendant . . . whereas nobody else in the jury box that I ever observed was even spending time looking at the defendant."  Defense counsel argued that she, too, had been watching the jurors but had not noticed anything out of the ordinary with this juror.  The district court, noting that it was not watching for eye contact with the defendant, accepted the prosecutor's explanation and dismissed the challenge.

In the context of a *Batson* challenge, we review the district court's determination that the prosecutor gave a race-neutral explanation for a peremptory strike of a juror for clear error.[50]  Given the subjective nature of jury selection, the district court's determination is likely to be based "largely on the

---

[49] *Id.* at 97.

[50] *United States v. Fields*, 72 F.3d 1200, 1206 (5th Cir. 1996).

No. 10-60917

court's evaluation of the credibility of counsel's explanation."[51] At the final stage of the *Batson* analysis, "implausible or fantastic justifications may (and probably will) be found to be pretexts for purposeful discrimination,"[52] but "intuitive assumptions," "inarticulable factors, or even hunches" can all be proper bases for rejecting a potential juror, even in the *Batson* context.[53] We have specifically approved of eye contact, or the lack thereof, as a valid neutral explanation.[54]

The outcome of Turner's *Batson* challenge necessarily turns on the credibility accorded to the prosecutor, both in terms of whether the potential juror actually stared at the defendant in an exceptional way and in terms of whether that fact (in addition to her family situation and lack of knowledge of her workplace), rather than her race, led to the peremptory strike. On both issues, the district court had the advantages of observing the voir dire, knowing the layout of the courtroom better than a written description can provide, and being able to consider the demeanor of the prosecutor as he made his explanation. The district court's rationale for approving the challenge is supported by statements in the record and is not clearly erroneous.

## VIII

Turner contends that the district court improperly denied him the opportunity to present surrebuttal to the Government's rebuttal case in the second trial. He argues that the rebuttal introduced a new issue to which he should have been allowed to respond.

---

[51] *United States v. Perkins*, 105 F.3d 976, 978 (5th Cir. 1997) (citing *United States v. Wallace*, 32 F.3d 921, 925 (5th Cir. 1994)).

[52] *Purkett v. Elem*, 514 U.S. 765, 768 (1995) (per curiam).

[53] *See United States v. Bentley-Smith*, 2 F.3d 1368, 1374 (5th Cir. 1993) (internal quotation marks omitted).

[54] *Id.* (citing *Polk v. Dixie Ins. Co.*, 972 F.2d 83, 86 (5th Cir. 1992) (per curiam)).

No. 10-60917

During that rebuttal, the Government called as a witness Anthony Davenport, a cellmate of Turner while he was in state custody before trial. Davenport testified that, during their time in jail together, Turner confessed to Davenport his involvement in the robberies and carjacking. The Government successfully argued that this was an appropriate subject for rebuttal because it contradicted Turner's testimony that his confession to police was false.

Once the Government rested, the court heard Turner's motion for surrebuttal, which it had postponed so it could consider Davenport's testimony. Turner proffered that he would call two witnesses. Robert Moore, a fellow inmate with Turner and Davenport, would testify that the layout of the county jail made private conversations like the one Davenport alleged impossible and that legal paperwork must be left unlocked (suggesting an alternative possibility for how Davenport learned details of Turner's crime). He would further testify that he had shared a cell with the two men for several months and that the conversation never actually occurred. Turner would also call an assistant district attorney who could testify that he had advised Davenport's lawyer that Davenport's testimony in the federal trial would be considered in resolving his state case. The district court denied the motion for surrebuttal.

"The decision to permit surrebuttal falls within the discretion of the district court and is subject to an abuse of discretion standard."[55] "Surrebuttal is merited where: (1) the government's rebuttal testimony raises a new issue, which broadens the scope of the government's case; and (2) the defense's proffered surrebuttal testimony is not tangential, but capable of discrediting the essence of the government's rebuttal testimony."[56]

---

[55] *United States v. Alford*, 999 F.2d 818, 821 (5th Cir. 1993) (citing *United States v. Moody*, 903 F.2d 321, 330 (5th Cir. 1990)).

[56] *Id.* (citing *Moody*, 903 F.2d at 331).

No. 10-60917

Here, Davenport's testimony went beyond the issues raised in the Government's case-in-chief, adding the significant allegation that not only had Turner committed the crimes at issue but that he had made a full confession to them. As for the second part of our test, Turner purported to offer a witness who could directly contradict Davenport's testimony; counsel proffered that Moore "would testify that he was in their presence for those past few months and *there were no such conversations in the cell*." This testimony is at least "capable of discrediting the essence of the government's rebuttal testimony."[57] The proposed testimony of the assistant district attorney would be less helpful in light of Davenport's testimony that he had not spoken with his lawyer as to any potential deal.

Even assuming that it was error to refuse to permit these surrebuttal witnesses, however, the error was harmless and thus does not require reversal. The Supreme Court, reminding us that "the Constitution entitles a criminal defendant to a fair trial, not a perfect one," has explained that even constitutional errors do not require reversal "if the reviewing court may confidently say, on the whole record, that the constitutional error was harmless beyond a reasonable doubt."[58] While some errors are so fundamental to a fair trial that they require automatic reversal in all cases, errors implicating the right to confront and impeach witnesses have been held only to the harmless-error standard.[59] Examining the surrebuttal denial under that standard, we conclude that any error would have been harmless.

There are several reasons for this conclusion. First, much of what Moore would have said had already been brought out on Davenport's cross-

---

[57] *Id.*

[58] *Delaware v. Van Arsdall*, 475 U.S. 673, 681 (1986).

[59] *See id.* at 681-82, 684; *Moody*, 903 F.2d at 331.

No. 10-60917

examination. Thus, it would not have changed the outcome for the jury to have heard a second witness confirm the layout of the cell (including the size of the cell and closeness of bunks) or that legal paperwork was available in the cell, both of which had already been admitted by Davenport. Second, while Moore would have added new information in his assertion that the conversation never occurred, for this to truly discredit Davenport the jury would have to believe that Moore had monitored every conversation between Turner and Davenport over a period of several months. Accordingly, this evidence would not have had much persuasive force.

Finally, the possibility of harm from allowing Davenport's testimony to go unrebutted must be considered in the context of the trial as a whole, a trial in which the other evidence of guilt was overwhelming. The jury saw a videotaped confession by the defendant that had been thoroughly tested for voluntariness, the jury heard eyewitness testimony from the scene of the crime, and there was forensic evidence. The Government did not focus on Davenport's testimony in closing argument. Davenport was a "jailhouse snitch" with his own credibility issues, such as a letter he wrote offering his testimony in exchange for leniency from state prosecutors (though maintaining that no deal was ever cut). Given all of these factors, the trial court's decision not to permit surrebuttal does not rise to a level requiring reversal.

## IX

Turner asserts that the district court erred in failing to grant his motion for a mistrial based on the Government's closing argument at the second trial. The relevant excerpt is as follows, with emphasis added as in Turner's brief:

> And, ladies and gentlemen of the jury, by your verdict today, you can hold this man accountable for his actions on July 7th, 2008. Officer *Collier deserves it*.
>
> *Just like the other police officers that are in this courtroom today*, those men and women, they put their uniforms on every day and

22

they latch that badge onto their belt or they put it onto their chest and they wear it proudly. And they put their life on the line. But you know what? Dewayne Collier can't do that anymore because of this man right here (indicating).

At the conclusion of the prosecutor's argument, Turner moved for a mistrial. The court denied the motion, then instructed the jury that it should base its verdict on the evidence:

> Let me before I read these final instructions give you an additional instruction. That is, your verdict, obviously, has to be based strictly on the facts of the case. Okay. It can't be based on prejudices or passions you may have about the circumstances of the case. The only thing that you can properly consider are my instructions on the law and the evidence that was presented here in the courtroom. For you to base your verdict on anything else would be wholly improper and a violation of the oath that you took when you were sworn in as jurors.

We review the denial of a motion for mistrial for abuse of discretion.[60] We analyze assertions of prosecutorial misconduct in closing arguments in two parts. We consider whether the prosecutor made an improper remark; if so, we then "evaluate whether the remark affected the substantial rights of the defendant."[61] The first question is reviewed de novo; the second is reviewed for abuse of discretion.[62] "A district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the evidence."[63]

---

[60] *United States v. Jimenez*, 509 F.3d 682, 691 (5th Cir. 2007) (citing *United States v. Wyly*, 193 F.3d 289, 298-99 (5th Cir. 1999)).

[61] *United States v. McCann*, 613 F.3d 486, 494 (5th Cir. 2010) (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)) (internal quotation marks omitted).

[62] *Id.*

[63] *Id.* at 495 (citing *United States v. Caldwell*, 586 F.3d 338, 341 (5th Cir. 2009)).

No. 10-60917

In assessing whether the remark made by the prosecutor was improper, we note that "[a] prosecutor is confined in closing argument to discussing properly admitted evidence and any reasonable inferences or conclusions that can be drawn from that evidence."[64] As we have explained, "[a] prosecutor is not permitted to make an appeal to passion or prejudice calculated to inflame the jury."[65] Whether the remarks at issue here fall into that category is a matter of interpretation. According to Turner, the Government's argument was that Collier *and his fellow officers* "deserved" a guilty verdict because they put their lives on the line, appealing to jurors' attitudes toward police officers. The Government counters that, in context, the remark was intended only to convey that Collier could no longer pursue his chosen career as a result of serious bodily injury (an element of the carjacking offense) caused by Turner, and the prosecutor wanted to impress upon the jury the seriousness of the charges.

We need not resolve that issue, however, because even if we assume, without deciding, that the remark was improper, the second step of the analysis demonstrates that Turner's substantial rights were not prejudiced. "Ordinarily, a defendant's substantial rights are affected only where the error in question affected the outcome of the district court proceedings."[66] To make that determination, "we assess '(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary instructions given, and (3) the strength of the evidence of the defendant's guilt.'"[67]

---

[64] *United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008).

[65] *United States v. Raney*, 633 F.3d 385, 395 (5th Cir. 2011) (quoting *United States v. Crooks*, 83 F.3d 103, 107 n.15 (5th Cir. 1996)) (internal quotation marks omitted).

[66] *McCann*, 613 F.3d at 496 (quoting *United States v. Marcus*, 130 S. Ct. 2159, 2164 (2010)) (internal quotation marks omitted).

[67] *Id.* (quoting *United States v. Gallardo-Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)).

No. 10-60917

We determine the magnitude of the prejudice by looking at the remarks in the context of the trial and their intended effect.[68] As Turner points out, the remarks pointed to uniformed officers present in the courtroom, which may have raised the inference that the officers "were watching" the jury. Or the remarks could have brought to the jurors' minds the associations they have with police. But this stray remark seems unlikely to have been much more prejudicial in this respect than the officers having been in the courtroom in the first place; the prosecutor never said "the officers are watching you," nor was this the theme of his argument.

More importantly, the district court can "purge the taint of a prosecutor's prejudicial comments" with a cautionary instruction, even, in some cases, one that is "merely generic."[69] Here, the court followed Turner's objection (made at a bench conference following the conclusion of argument) with an immediate instruction. The instruction did not specifically mention any statement that was made but reminded the jury that its verdict must be based on the evidence and not on prejudice or passion. "We presume that such instructions are followed unless there is an overwhelming probability that the jury will be unable to follow the instruction and there is a strong probability that the effect [of the improper statement] is devastating."[70] Turner has not argued that these circumstances exist, and they are not apparent from the record.

The final factor is the strength of the evidence of guilt. Turner argues that, since the jury deadlocked on the carjacking counts at the first trial but convicted at the second, the improper comments must have been *the* crucial

---

[68] *Id.*

[69] *Id.* at 496-97 (quoting *United States v. Gracia*, 522 F.3d 597, 604 (5th Cir. 2008)) (internal quotation marks omitted).

[70] *Gallardo-Trapero*, 185 F.3d at 321 (alteration in original) (quoting *United States v. Tomblin*, 46 F.3d 1369, 1390 (5th Cir. 1995)) (internal quotation marks omitted).

factor that tipped the scales. But Turner's assertion that the evidence was "substantially similar" at both trials ignores his own testimony. He only took the stand in his second trial. Substantial other evidence of Turner's guilt was presented to the jury, including testimony by his co-defendant Cornelius Black and Turner's videotaped confession. "Where there is a great deal of inculpatory evidence presented against a defendant, we often find that improper statements were harmless error."[71]

Given the minor nature of the remark in the overall context of the trial, the curative instruction (with no evidence that it was not followed), and the amount of inculpatory evidence on which the jury would have relied in the absence of the remark, the district court did not abuse its discretion in denying Turner's motion for a mistrial.

## X

At the conclusion of the second trial, the district court instructed the jury that it could convict Turner even if he had only aided and abetted the commission of the crimes. Turner argued that the relevant counts of the indictment named *only* Antonio Turner as the perpetrator of the carjacking and shooting, so adding an instruction that could hold him accountable for someone else committing those crimes would amount to a constructive amendment to the factual basis of the indictment. Turner also complained of unfair surprise given the Government's consistent theory, through both trials, that Turner pulled the trigger and stole the car and that there was no third person involved (in addition to Turner and Black). Turner further asserted that his decision to take the stand—and implicate a third person—might have been different had he known the aiding and abetting instruction would be given. The court overruled the objection. In this case, the possibility of giving an aiding and abetting

---

[71] *McCann*, 613 F.3d at 497.

instruction on the carjacking counts evidently was not mentioned until the conclusion of all the evidence in the second trial.  While aiding and abetting is at least an implied charge in every indictment,[72] the section of the United States Code defining it (18 U.S.C. § 2) was specifically mentioned in Turner's indictment on the robbery counts but not on the carjacking counts.  An instruction on aiding and abetting was given in the first trial but was specifically limited to the robbery counts.  It was given for the carjacking counts in the second trial over a defense objection.  The court  ruled that the instruction was appropriate in the second trial because of the testimony of Turner, who had not testified in his first trial, and that of a defense witness, Bob Sheppard.

Sheppard had testified that he and a friend were driving into Jackson when they came upon the scene of the shooting.  He stated that he initially saw a man wearing light clothes standing over the officer with a gun, but when the man drove away in the police car, he noticed a second man in the passenger seat of the car.  On cross-examination, the Government showed Sheppard a picture of the passenger seat of the police vehicle with some items in it, soliciting and receiving the answer that it would have been difficult for someone to sit in that seat had those items been there.  On redirect, Sheppard added that he was not absolutely sure that a second person had been in the front seat.

When Turner took the stand in his own defense, he claimed that in addition to himself and Black, a third individual, "Lynn," had participated in the robberies.  In Turner's version of events, he described his role as driving Black and Black's friend, Lynn, a male, in a borrowed Kia as the two of them robbed Title Loans and Popeyes.  The group encountered Officer Collier and led him on a chase down Highway 80 until the Kia crashed.  The occupants "bailed out" of the car, and Turner ran into the nearby woods where he heard gunshots and

---

[72] *United States v. Neal*, 951 F.2d 630, 633 (5th Cir. 1992).

dropped to the ground.  From there, he saw that a window in the police car had been shot out, but he did not know who was doing the shooting.  Fearful that Black or Lynn had been shot, Turner ran back toward the car before realizing that it was the officer who had been shot.  At this point, Turner said he believed that he would be killed if he remained in the woods, which he understood to be a common outcome in Jackson when an officer is shot and the suspect is in a wooded area.  Turner observed Lynn pulling the officer from the police car, at which point Turner jumped through the back window of that vehicle into the backseat.  Lynn then drove the police car away from the scene but lost control of the vehicle while fleeing and crashed in a ditch.  Turner and Lynn abandoned the vehicle, hid under a house, and later departed in different directions.

On cross-examination, the Government had Turner read aloud from the transcript of his videotaped confession, in which he said:

> It was just me.  I jumped in the car by myself. . . .  I crashed the car.  I jumped out the car and I shot him.  I shot—I shot him.  Didn't nobody else shoot.  I shot.  And I jumped and I went to the car.  The reason I went to the car, I ain't know if he was dead or not.  I ain't gone lie.  I didn't.  I ain't know if he was dead or alive.  I just snatched him out and then got in the car and left.

The Government's theory of the case continued to be that Turner had acted alone in shooting Officer Collier and stealing the police vehicle.  Throughout its opening statement and closing argument, the Government insisted that the existence of a third person "was a made-up story," quoting Turner's confession ("It was just me.") and citing gunshot residue found on Turner's hands to indicate that he had discharged a firearm.  The Government reiterated that Turner (in his videotaped confession), Black (who claimed to have seen the event), and "jailhouse snitch" Anthony Davenport (who claimed Turner had confessed to him while incarcerated) all indicated that Turner committed the

crime alone.[73] During Black's direct testimony, the Government asked several times about previous statements he had made as to the involvement of a third person in the robberies, in response to which Black firmly asserted that those statements were false and made at Turner's urging. Even in those prior statements, Black implicated only Turner as the individual who shot Officer Collier. The Government concluded its redirect examination with a series of questions emphasizing that only Black and Turner were involved in the crimes and that Turner shot Officer Collier.

"We review the district court's decision to give the aiding and abetting instruction for abuse of discretion."[74] We will only reverse a decision to give an aiding and abetting instruction when there has been a showing of unfair surprise.[75] We adhere to this rule because "[a]iding and abetting is not a separate offense, but it is an alternative charge in every indictment, whether explicit or implicit."[76]

In *United States v. Neal*, we upheld such an instruction even though the "indictment charged [the defendant] as a principal and did not include aiding and abetting language or charge her with conspiracy"; the claim of surprise was undercut because the indictment made reference to the aiding and abetting statute, 18 U.S.C. § 2.[77] Similarly, in *United States v. Botello*, we allowed the

---

[73] The prosecutor said:

> Who shot Officer Collier? Antonio Turner. Who took Officer Collier's car? Antonio Turner. Cornelius Black told you that. Antonio Turner told you. Anthony Davenport told you that. They were all three consistent on the same point. That man right there (indicating) shot Officer Dewayne Collier on July 7th, 2008.

[74] *United States v. Botello*, 991 F.2d 189, 191 (5th Cir. 1993).

[75] *Neal*, 951 F.2d at 633.

[76] *Id.*

[77] *Id.*

instruction in a case in which the prosecutor's opening statement claimed the defendant had personally killed the victim, but "evidence introduced by the government tended to prove that Botello acted as an aider and abettor."[78]  In that case, "because the indictment did not foreclose the possibility of conviction as an aider and abettor," it was not an unfair surprise to give the instruction.[79] The district court here also relied on *United States v. Castillo-Morales*, an unpublished decision holding that the defendant could not "claim unfair surprise when it was his own testimony that prompted the Government to request the aiding and abetting instruction."[80]

To be convicted under an aiding and abetting theory,  the defendant must "share[] in the principal's criminal intent" and take some affirmative steps "to aid the venture or assist[] the perpetrator of the crime."[81]  He "must have aided and abetted each material element of the alleged offense[s]."[82]  "[M]ere presence at the scene of the crime is not sufficient, by itself, to support aiding and abetting liability."[83]

In this case, the jury was presented with evidence of two potential factual scenarios: in one, Turner acted alone as the carjacker and shooter, while in the other, Lynn acted alone as the carjacker and shooter.  To convict Turner under an aiding and abetting theory, the jury would have had to believe more than the "Lynn" scenario.  The only evidence of Lynn's involvement came from the testimony of Turner and Sheppard.  Based on Turner's testimony, there was no

---

[78] 991 F.2d at 192.

[79] *Id.*

[80] 351 F. App'x 905, 906 (5th Cir. 2009) (unpublished opinion).

[81] *United States v. Garcia*, 242 F.3d 593, 596 (5th Cir. 2001).

[82] *United States v. Lombardi*, 138 F.3d 559, 561 (5th Cir. 1998).

[83] *Garcia*, 242 F.3d at 597.

evidence that Turner did anything other than jump into the police vehicle after Lynn had shot and removed Officer Collier. There was no evidence presented that Turner shared Lynn's criminal intent to cause death or serious bodily harm in taking the vehicle, the elements of the carjacking offense.[84] Just as the Government attempted to disprove that Lynn was involved at all, Turner testified at trial that he had already left the scene when he heard the shots being fired. Notably, after Turner testified, the Government did not, in its cross examination of Turner, in its rebuttal case, nor in its closing or rebuttal argument, intimate any theory of liability based on aiding and abetting. Because there was no aiding and abetting scienter evidence offered by either party, the district court erred in giving the instruction.

This error, however, does not compel us to reverse the district court. In *Hedgpeth v. Pulido*, the Supreme Court confirmed that when a jury is "instructed on multiple theories of guilt, one of which is improper," the "harmless-error analysis applies to instructional errors so long as the error at issue does not categorically vitiat[e] *all* the jury's findings."[85] The Court further explained that "[a]n instructional error arising in the context of multiple theories of guilt no more vitiates *all* the jury's findings than does omission or misstatement of an element of the offense when only one theory is submitted."[86] The Court's decision in *Hedgpeth* instructs that the question for the reviewing court when multiple theories of guilt are presented and one is improper is the

---

[84] 18 U.S.C. § 2119.

[85] 555 U.S. 57, 61 (2008) (per curiam) (alteration in original) (quoting *Neder v. United States*, 527 U.S. 1, 11 (1999)) (internal quotation marks omitted); *see also Skilling v. United States*, 130 S. Ct. 2896, 2934 n.46 (2010) (explicitly extending *Hedgpeth* to cases on direct review).

[86] *Hedgpeth*, 555 U.S. at 61.

No. 10-60917

familiar *Brecht* standard, which is "whether the flaw in the instructions 'had substantial and injurious effect or influence in determining the jury's verdict.'"[87]

In Turner's case, while the jury should not have been instructed on an aiding and abetting theory, the error did not have a substantial and injurious effect or influence on the verdict. As discussed above, there was no evidence that would have supported a conviction on the basis of aiding and abetting liability. The evidence that Turner was the shooter and the carjacker was overwhelming. The error was therefore harmless.

## XI

Finally, Turner asserts several challenges that he concedes are foreclosed by this circuit's precedents. He acknowledges that he is merely preserving these issues for further review by this court sitting en banc or by the Supreme Court. Briefly, he argues that the minimal interstate commerce nexuses we require for a prosecution under the federal robbery statute (the Hobbs Act),[88] the federal carjacking statute,[89] and the federal felon-in-possession statute[90] are each insufficient to satisfy the Interstate Commerce Clause standard set forth in *United States v. Lopez*.[91] He also argues that he should have only received one sentence for the two separate crimes of using a firearm in relation to the robbery

---

[87] *Id.* at 58 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993)).

[88] *See United States v. Robinson*, 119 F.3d 1205, 1215 (5th Cir. 1997); *see generally United States v. McFarland*, 311 F.3d 376 (5th Cir. 2002) (en banc) (per curiam); *United States v. Hickman*, 179 F.3d 230 (5th Cir. 1999) (en banc) (per curiam).

[89] *See United States v. Frye*, 489 F.3d 201, 214 (5th Cir. 2007); *United States v. Jimenez*, 323 F.3d 320, 322 (5th Cir. 2003) (citing *United States v. Coleman*, 78 F.3d 154, 159 (5th Cir. 1996); *United States v. Harris*, 25 F.3d 1275, 1280 (5th Cir. 1994)).

[90] *See United States v. Rawls*, 85 F.3d 240, 242-43 (5th Cir. 1996); *see also id.* at 243 (Garwood, J., specially concurring) (discussing the statute's viability after *United States v. Lopez*).

[91] 514 U.S. 549 (1995).

No. 10-60917

and the carjacking, urging us to reconsider our recent contrary decision interpreting the statute under which he was convicted.[92] Bearing in mind that a later panel of this court cannot overrule an earlier panel decision,[93] we reject all of these challenges.

*     *     *

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[92] *See United States v. Houston*, 625 F.3d 871, 873-74 (5th Cir. 2010), *cert. denied*, 131 S. Ct. 1704 (2011) (holding that the statutory exception to applying an additional mandatory sentence for using a firearm when "a greater minimum sentence is otherwise provided by this subsection or by any other provision of law" is applicable "only to a greater mandatory minimum sentence for *th[e] specific crime* of firearm possession."); *see also* 18 U.S.C. § 924(c).

[93] *See, e.g.*, *Hill v. Carroll Cnty., Miss.*, 587 F.3d 230, 237 (5th Cir. 2009).